In re WINDSOR COMMUNICATIONS GROUP, INC. t/a Norcross-Rust Craft Greeting Card Publishers, Debtor.

WINDSOR COMMUNICATIONS GROUP, INC. t/a Norcross-Rust Craft Greeting Card Publishers, Plaintiff,

v.

METROPOLITAN CONSOLIDATED INDUSTRIES, INC., Defendant/Third Party Plaintiff,

v.

The CRYSTAL GROUP OF COMPANIES, Third Party Defendant/Second Third- Party Plaintiff,

v.

Robert E. RUNYAN and Barbara L. Runyan, h/w Second Third-Party Defendants.

Bankruptcy No. 82–03714K.
Adv. No. 84–0714S.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 15, 1987.

Albert A. Ciardi, Jr., David S. Fishbone, Philadelphia, Pa., for debtor/plaintiff.

Alan C. Gershenson, Philadelphia, Pa., for defendant/Metropolitan Consol. Industries, Inc.

Kenneth F. Carobus, Philadelphia, Pa., for third party defendant/The Crystal Group of Companies.

Susan L. Claypoole, Philadelphia, Pa., Ben Goodin, Chicago, Ill., for second third-party defendants/Robert E. and Barbara L. Runyan.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

After over a year of some measure of familiarity with this long-outstanding adversarial proceeding, the principal issues of which concern claims of various parties regarding their respective rights to possession of certain films, embossing plates, and stamping discs used to manufacture greeting cards (hereinafter referred to as "the designs"), and their rights to and from damages among themselves as a result of the determination of the rights of possession, we are finally in a position to resolve all of the outstanding issues in this matter.

We adhere to our earlier holding that the Plaintiff-Debtor, WINDSOR COMMUNICATIONS GROUP, INC., t/a NORCROSS–RUST CRAFT GREETING CARD PUBLISHERS (hereinafter referred to as "the Debtor"), is entitled to possession of the designs. We also hold that the original Defendant, METROPOLITAN CONSOLIDATED INDUSTRIES, INC. (hereinafter referred to as "Metro"), is liable to the Debtor in a total sum of $123,450.00 for the Debtor's loss of possession of 6,891 of the designs for a five-year period and the total loss of 2,727 of the designs, plus all costs associated with the Debtor's within action. However, in light of the fact that both parties to a transaction of July 13, 1983, in which Metro sold all of its assets to Second Third-Party Defendants ROBERT E. RUNYAN and BARBARA L. RUNYAN (hereinafter referred to as "the Runyans"), contend that the designs were not a part of the sale, we are revising our earlier conclusion that the designs were passed along to the Runyans in this transaction or in a subsequent sale by the Runyans of the stock in their business to Third-Party Defendant THE CRYSTAL GROUP OF COMPANIES (hereinafter referred to as "Crystal"), on September 18, 1985.

Therefore, the only liability which we find among the parties other than that of Metro to the Debtor is liability of Crystal over to Metro for the period in which it intentionally retained the designs, which we calculate at $13,782.00, plus part of the costs imposed upon Metro.

We also hold that Metro is liable to the Debtor in the amount of $37,942.43 on a relatively straightforward preference Count also pleaded in this action, thus rendering its total liability to the Debtor in this action as $161,374.43.

The underlying bankruptcy case was initiated by the filing of an involuntary Chapter 7 petition against the Debtor on August

5, 1982, which was converted to a Chapter 11 case on the Debtor's motion on August 25, 1982. This proceeding was not initiated until June 19, 1984. Discovery proceeded at a deliberate pace through 1985, with the Debtor being awarded monetary sanctions totalling $1,226.50 on January 28, 1985, and $420.00 on May 28, 1985, against Metro for the failure of the latter's original counsel to make adequate responses to discovery.

In October, 1985, the parties both filed Motions for partial summary judgment, which were apparently both informally denied by our predecessor, the Honorable William A. King, Jr. We first became aware of presence of this case after our appointment to the bench on August 27, 1986, when the parties requested a conference rather than try the matter on September 17, 1986, when it was listed. After a conference, we entered an Order of September 12, 1986, directing that the parties endeavor to settle the case or in the alternative prepare a Stipulation of Facts, after which a further conference would be conducted. Although the Stipulation of Facts was prepared, no further resolution was attained. However, during this period, it should be noted that none of the designs in issue had been located, and the only real area of dispute was the measure of damages for their loss.

In December, 1986, counsel for the Debtor, as had counsel for Metro, changed hands. In a conference with new counsel, we learned that Metro had located the designs in a facility now owned by Crystal, but that Crystal refused to release them. Although the Debtor initially indicated an intention to join Crystal as a party defendant, when it failed to do so, Metro itself successfully, per our Order of February 4, 1987, moved to join Crystal as a third party defendant.

When Crystal answered, on April 10, 1987, it also filed a Second Third-party Complaint against the Runyans. The Runyans filed a Motion to Dismiss for lack of personal jurisdiction and venue, which they subsequently withdrew. On May 22, 1987, at the request of all of the now-multifarious parties, we scheduled a conference.

We learned that a snag had developed over what employees of the Debtor would be delegated to travel to Crystal's facility in Waukegan, Illinois, to determine whether the designs there were in fact those in issue and, if so, how many were there, and over who would pay for same. We entered an Order that day directing Crystal to permit entry to the Debtor's delegates to conduct an inspection and for Metro to advance $1,000.00 towards costs, the ultimate liability for the imposition of which would be determined at the time of disposition of the case. We also directed the Debtor to file and serve upon all interested parties, on or before June 29, 1987, a report of its delegates' investigation and scheduled a hearing on July 28, 1987, to resolve the issue of what portions of the designs were at the Waukegan facility and to prepare a schedule for disposition of all issues in this case.

The July 28, 1987, hearing was continued to August 11, 1987. At the close of that hearing, convinced that the Debtor's President, Daniel J. Coffey (hereinafter referred to as "Coffey"), had accurately reported that approximately 6,800 of the designs in question were in fact in Crystal's facility, we indicated a willingness to order that the Debtor be entitled to recover these designs immediately, as a backdrop for deciding the other issues in the case. Crystal vigorously opposed such a disposition, beginning a course of action which has consistently set Crystal at odds with all of the other parties in the action.

On August 17, 1987, we issued an Order confirming an agreed schedule for final disposition of the case, culminating in a trial on October 22, 1987, and ordering Crystal to allow the Debtor to recover the designs at the facility immediately. However, recognizing that we had not provided Crystal with any notice prior to August 11, 1987, that we might resolve the issue of the disposition of the designs at this time, we allowed Crystal to file a motion to stay this Order and scheduled a hearing on August 27, 1987, on any stay motion which it might file.

Crystal did file a stay motion. At the hearing on August 27, 1987, its principal witness was James N. Splayt (hereinafter referred to as "Splayt"), who had been, since 1975, the general manager of the facility in Waukegan, Illinois, where the designs had been located since 1979 throughout the changes in ownership of the facility and who had steadfastly denied that they were in fact located in the facility despite inquiries from the Debtor and Metro from 1984 through 1986. Splayt's testimony confirmed our belief that the designs in Waukegan were in fact among those in issue in this suit. We therefore entered an Order of August 28, 1987, denying Crystal's stay motion and reiterating the substance of our Order of August 17, 1987.

Crystal appealed our Order of August 28, 1987, to the District Court and sought a stay of our Order pending appeal from that court. On October 15, 1987, District Judge Edward N. Cahn entered an Order denying the stay order for the most part, and allowing the Debtor or Metro to prepare for shipment of the designs to the Debtor, but directing that the designs not be moved until October 22, 1987, the date of the trial, which was by then upon us.

At Crystal's request, upon the conclusion of the trial on October 22, 1987, we vacated our Orders of August 17, 1987, and August 28, 1987. We did this not as a concession that these Orders were in any sense erroneous, but because all of the other parties, including the Debtor, advised that they favored the entry of such an Order, as it would obviate considerable labors of all involved in briefing the issue of whether any order was properly entered prior to the conclusion of the full trial on the merits, and that this issue could be eliminated by our reentering a similar Order at that point, after the conclusion of the trial. We concurred with this reasoning.

We then proceeded to file an unpublished Memorandum dated October 27, 1987, substantively re-entering the same Orders as we did on August 17, and August 28, 1987, portions of which we incorporated herein. We note that Crystal has appealed that Order also, at Civil Action No. 87–7631

(E.D.Pa.), but that, per a Schedule of briefing set forth in an Order of the Honorable Joseph S. Lord, III, to whom that matter was originally assigned before its reassignment to the Honorable Raymond J. Broderick, on December 8, 1987, the matter will not be submitted until mid-January, 1988, after the entry of our decision here. In our Order of October 27, 1987, we also directed that, since the Plaintiff was prepared to initially stand on its previously submissions concerning the final disposition of this case, the other parties were given the opportunity to file responsive Proposed Findings of Fact and Conclusions of Law and Briefs in support of their respective positions on or before November 16, 1987, and all parties were permitted to file any additional Reply Briefs on or before November 30, 1987.

Although many of the underlying facts are undisputed, we are obliged to make certain significant factual determinations in order to resolve certain aspects of the damage claims. This and the dictates of Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), prompt us to present this Opinion in the classic form of Findings of Fact, Conclusions of Law, and a Discussion. However, in several of our Conclusions of Law, we are including brief discussions and several citations which shall constitute our complete coverage of those issues, and we are therefore confining the subject matter of our Discussion to (1) General principles relevant to ascertainment of the rights and liability of the parties *inter se* in reference to the designs, relying heavily upon the analysis of the law of bailment set forth by the Runyans in their Brief; and (2) General principles relevant to the measure of damages, justifying our computation of same here to reach our result.

## B. FINDINGS OF FACT

1. On or about September 30, 1977, Norcross, Inc. (hereinafter referred to as "Norcross"), a Pennsylvania corporation which was one of the predecessors of the Debtor, and Metropolitan Greetings, Inc. (hereinafter referred to as "Metro Greetings"), a Delaware corporation which was

one of the predecessors of Metro, entered into an agreement (hereinafter referred to as "the First Agreement"), which provided, *inter alia,* that Norcross licensed to Metro Greetings the use of approximately 14,000.-00 greeting card designs for use in Metro Greetings' own production and manufacture of greeting cards and related items (*e.g.,* gift wrap), for three years at a fee of $10.00 per design. It was ascertained by Coffey that in fact the Debtor originally delivered only 10,924 designs to Metro Greetings and that 1,098 were returned, leaving a balance of 9,816 licensed and unreturned designs.

2. The designs which Norcross provided to Metro Greetings, were original films, not copies or duplicates. In addition, Norcross did not retain any copies or duplicates of the design films. This was a deviation from the standard practice in the greeting card industry, and was explained by the testimony of Coffey that the cost of making duplicates, estimated at $20.00 per design, would have doubled the license fees charged.

3. On January 18, 1979, Metro Greetings filed a petition under Chapter XI of the former Bankruptcy Act in the Bankruptcy Court of the United States District Court for the District of Massachusetts, and thereafter was appointed as a Debtor-in-Possession, allowing it to operate its greeting card business in the ordinary course.

4. At the time of the filing of the petition, Metro Greetings, in addition to its principal place of business in Cambridge, Massachusetts, leased and operated its greeting card business out of, *inter alia,* a facility located in Waukegan, Illinois.

5. On or about April 23, 1979, Metro Greetings was acquired by United Capital Corporation (hereinafter referred to as "United"), pursuant to an agreement approved by the Bankruptcy Court.

6. On or about July 1, 1979, Metro Greetings was forced to vacate its principal place of business in Cambridge, Massachusetts. As a result, in a hurried and unorganized manner, much of the contents of the Cambridge facility were loaded onto trucks and shipped to the Waukegan facility. Among the items shipped were the designs in issue.

7. Due to the financial distress of Metro Greetings, it failed to make the payments pursuant to the First Agreement. Therefore, Norcross and Metro Greetings entered into a supplemental agreement (hereinafter referred to as "the Supplemental Agreement") on August 21, 1979. Pursuant to the terms of the Supplemental Agreement, Metro Greetings promised to make all payments due under the First Agreement, and was permitted to retain the designs until August 21, 1982, without making any payments in addition to those required under the First Agreement.

8. In 1980, United purchased an unrelated business, a paint manufacturing business, Woolsey Marine Paint, and consolidated that company's business structure with that of Metro Greetings. In December, 1980, the entire company was given the name of the Defendant, Metropolitan Consolidated Industries, Inc. (Metro), the greeting card division of which continued to operate out of the Waukegan facility.

9. Prior to its bankruptcy, Metro Greetings maintained several divisions, among which were Fuld and Co. (hereinafter referred to as "Fuld") and Crystal Greetings, both of which operated out of the Waukegan facility after United's acquisitions of Metro Greetings.

10. From 1975, until sometime in 1987, Splayt served in a managerial capacity of the Waukegan facility, first in the employ of Metro Greetings, then in the employ of United/Metro, then in the employ of the successive purchasers of that facility.

11. On July 13, 1983, with Splayt acting as a go-between, Metro entered into an Agreement with the Runyans, who were owners of the Waukegan building and longtime landlords of the greeting-card businesses that were situated there, for sale of the assets in the facility to a new corporation formed by the Runyans called Buy–A–Card, Inc. (hereinafter referred to as "BAC"), for $775,000.00.

12. The aforesaid Agreement specifically designated certain of the assets transferred, including the business names "Crystal Greetings" and "Fuld & Co.," "[a]ll fixed assets, fixtures, and equipment owned by the Seller," and "[a]ll inventories of greeting cards" presently located at the Waukegan facility.

13. Both Metro and the Runyans now contend that the designs, though located in the facility, were not included in the transaction. Splayt, as is indicated at Findings of Fact 17–19, page 720 *infra*, claims not to have known that they were there, and hence could not have made mention of their inclusion as part of the transaction at the time.

14. Thereafter, BAC changed its name to Crystal Greetings, Inc. (hereinafter referred to as "CGI"). Splayt, at that time or shortly thereafter, became president of CGI and continued to be responsible for the operations of the Waukegan facility. The Runyans remained sole shareholders of CGI.

15. The term of the Supplemental Agreement between Norcross and Metro Greetings expired on August 20, 1982, shortly after the filing of the Debtor's bankruptcy. Due in part to the confusion resulting from the bankruptcy proceeding and the contraction of the Debtor from a business employing 2,000 to one employing only 40 persons, the failure of Metro to return the designs was overlooked by the Debtor until early 1984, when Coffey uncovered the First Agreement and the Supplemental Agreement.

16. Consequently, the Debtor did not make any demand for the return of the designs until the spring of 1984, at which time Coffey wrote a letter demanding return of the designs which was followed by a letter of April 26, 1984, from the Debtor's counsel to Attilio Petrocelli, Metro's President, demanding their return.

17. Orlando Petrocelli, Vice-President of Metro, immediately forwarded the letter from the Debtor's counsel to Splayt with a cover letter asking Splayt "to arrange to return the material requested." In response, Splayt advised Orlando Petrocelli, both by phone and letter, that he had no knowledge of the presence of the designs or the agreements between Norcross and Metro Greetings.

18. According to Splayt, at no time during or after this exchange of calls and correspondence did he or anyone at CGI undertake any review or investigation to determine whether or not the designs were, in fact, at the Waukegan facility, and therefore they were never located.

19. In depositions taken in this case on February 20, 1985, and in depositions in a collateral matter pending before the United States District Court for the Northern District of Illinois (No. 86–C–1388), on July 18, 1986, Splayt denied any knowledge of the presence of the designs at the Waukegan facility.

20. In September, 1985, Crystal was formed and purchased the stock of CGI from the Runyans in an Agreement of September 18, 1985. An Exhibit to the stock purchase agreement noted the existence of the instant proceeding, stating that CGI "is involved only as a potential witness at this point, although it could be joined as a third party defendant, particularly if the 'film library' which the plaintiff is seeking is alleged to be in Crystal's possession." This passage indicates an awareness of Crystal, from its inception, that it might indeed have in its possession designs of which the Debtor had a claim of right to possession.

21. In Fall, 1986, Metro's ongoing investigations uncovered information indicating that the films in question were, in fact, located at Crystal's Waukegan facility.

22. The examination of the facility by Coffey and several other individuals on June 9–11, 1987, and the examination of the designs there, established, to our complete satisfaction, that 6,891 sets of the designs in issue were among those located at Crystal's facility in Waukegan.

23. On June 24, 1986, and July 21, 1986, Metro took the depositions of Gordon S. Smith and William T. Wolfe, respectively, who had been identified by the Debtor as

its expert witnesses on the issue of valuation of the designs in issue.

24. Mr. Smith stated that good designs were worth as much as $300.00 to $400.00 apiece, and that many of the Norcross designs were among the finest in the United States. However, he also stated that values of designs vary and that he never had seen the designs in issue in this litigation. He also stated that, in his experience in the industry, copies were always made of designs before their possession was entrusted to anyone.

25. Mr. Wolfe testified that he intended to utilize an estimate of $150.00 per design in evaluating them. While he also stated that Norcross had a fine line of designs, he also stated that he had never seen the designs in issue.

26. At trial Coffey testified that the designs, if available to the Debtor, could have been licensed at $70.00 per design for any territory in the world in which they were licensed. Based upon this figure, he estimated that the market value of the designs amounted to $150.00 per design. In addition, interpolating from the First Agreement of September 30, 1977, leasing the designs for $10.00 apiece for three years, he calculated the loss of the use of the designs for the five-year period from 1982 to 1987 at $16.67 apiece.

27. On cross-examination, Coffey admitted that, in testifying at hearings in this Court concerning confirmation of the Debtor's Plan, he had testified that the Debtor's entire film library of over 68,000 films at a value of approximately $625,000.00.

28. Further, on cross-examination, Mr. Coffey indicated that, in the 14-month period immediately following Confirmation, from May 31, 1985, to July 31, 1986, the Debtor had sold, licensed, or otherwise transacted but 2,256 designs out of its total library of 68,732 film sets, deriving a total revenue of $150,859.00 therefrom.

29. Annualizing this figure and calculating in the Debtor's overhead to house its film library, including making duplicates, insurance, storage, and personnel, Metro deduced that the Debtor's lost revenue from the designs was but fifty-nine ($.59) cents per design per year, or $19,861.17 for its lost use of the designs found in Waukegan over a five-year period. Utilizing a "reasonable multiplier" of ten on the annual yield of $.59 per year, Metro further deduced that the lost capital asset of the remaining 2,727 designs which have been totally lost was $16,089.30, and that the Debtors suffered a maximum total loss of $35,950.47.

■ 30. The best measure of the hotly-disputed value of the designs is that which can be derived from the figures negotiated by both parties' precedessors in the apparently arms-length First Agreement of September 30, 1977, as modified by the Supplemental Agreement of August 29, 1979.

31. In the Supplemental Agreement, the figure for licensing the designs for a period extended to five years, i.e., September, 1977, through August, 1982, was $10.00 per design. This figure is very close to the estimate of the value of the remaining designs given by Mr. Coffey at the Confirmation hearings. Thus, $10.00 per design is a reasonable measure of the loss of the use of the designs for the subsequent five-year period from August, 1982, through 1987, thus rendering the loss of use of the 6,891 designs which have been located at $68,910.00.

32. Under this calculation, the annual yield on a given design is $2.00 per year. Adding the "reasonable multiplier" of ten introduced by Metro, the value of each lost design is calculated to be $20.00, and the lost capital asset of the 2,727 designs which have not been located is determined to be $54,540.00. The total value of damages to the Debtor from Metro in connection with the designs is therefore $123,450.00.

33. After it was added as a third-party defendant in these proceeding, Crystal filed for bankruptcy in the Northern District of Illinois. However, Metro was granted relief from the automatic stay in Crystal's bankruptcy on August 11, 1987, to permit the Debtor and/or Metro to proceed to litigation in this litigation as to all claims and/or causes of action, which, as of that date, had been asserted against Crystal.

34. Crystal is directly responsible for Metro's inability to return the designs which are presently in its possession to the Debtor as of the date that it knew of the Debtor's right to them, which we find was approximately one year ago. The loss of use for which Crystal can be held liable over to Metro can be measured at $2.00 per year per design, the annual yield of same.

35. The Second Count of the Complaint involves an entirely different set of occurrences which began on or about September 22, 1981, at which time Fuld shipped certain greeting cards worth $129,477.50 to the Debtor's receiving facility in Joliet, Illinois, pursuant to a purchase order from the Debtor.

36. In order to arrange a schedule to pay the invoice for the cards received, the Debtor issued three notes, bearing interest of eighteen (18%) percent, each in the amount of $43,159.17, the first two of which were paid.

37. Metro agreed to accept, in lieu of the cash amount due on the final note of $49,266.19, including accrued interest, a shipment of greeting cards from the Debtor, which Metro received, through its Crystal division, at Waukegan on or about August 11, 1982.

38. Metro did not give new value to the Debtor in exchange for the greeting cards shipped to it on or about August 11, 1982.

39. Coffey provided the only testimony of the value of the greeting cards shipped, indicated that the value was one-half the wholesale value of $75,848.85, which was itself one-half the retail value of $151,697.70, or $37,924.43. This testimony was unrebutted and credible.

40. Although Splayt claimed the cards had too many titles and were difficult to sell, he also testified that Metro did accept the greeting cards and eventually resold them. Metro failed to produce an alleged letter from Attilio Petrocelli complaining about the quality of the cards.

## C. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this proceeding. Although this proceeding clearly could not be characterized, like many others associated with this bankruptcy case, as a "garden-variety accounts receivable proceeding," *see In re Windsor Communications Group, Inc.*, 67 B.R. 692 (Bankr.E.D.Pa.1986), and hence does not appear to be a core proceeding, the implicit agreement of all of the parties that this Court may determine the matter authorizes us to do so. 28 U.S.C. § 157(c)(2). *See Holloway v. Heci Exploration Co. Employees' Profit Sharing Plan*, 76 B.R. 563, 570–71 (N.D.Tex.1987); *In re Wicaco Machine Co.*, 60 B.R. 415, 417 (E.D.Pa.1986); *In re CG Realty Investments, Inc., Campbell v. CG Realty Investments, Inc.*, 79 B.R. 249, 252 (Bankr.E.D.Pa.1987); and *In re A.I.A. Indus., Inc.*, 75 B.R. 1013, 1017 (Bankr.E.D.Pa.1987).

2. The pivotal First Agreement and Supplemental Agreement of September 30, 1977, and August 21, 1979, are governed by the law of Pennsylvania, *see Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 283–84 (3d Cir.1980); and *Neville Chemical Corp. v. Union Carbide Corp.*, 422 F.2d 1205, 1210–11 (3d Cir.1970) (federal court sitting in Pennsylvania applies Pennsylvania "interest analysis-significant contacts" test) because the owner and licensor of the designs is a Pennsylvania corporation, and hence this forum jurisdiction has the most significant contacts with this matter. The Agreements of July 13, 1983, and September 18, 1985, transferring the assets of the original licensee, which expressly state that they are controlled by Illinois law, are governed thereby. *See In re Diaz Contracting, Inc.*, 817 F.2d 1047 (3d Cir.1987). However, the relative rights of the parties to possession of the designs flow from the First Agreement and Supplemental Agreement licensing them, not from the Illinois agreements. Therefore, while we agree with the Runyans' general hypothesis that the law of bailment should be applied here, we believe that the law of Pennsylvania rather than that of Illinois is controlling. However, we also observe that the parties have not identified any significant distinction between the laws of these two states.

■ 3. The accepting and taking possession of the designs from the Debtor by Metro's predecessor created a contractual bailment relationship with respect to the designs under which the Debtor was the bailor and Metro was the bailee.

■ 4. Metro, as bailee, was entitled to exercise dominion and control over the designs until the expiration of the term of the Supplemental Agreement on August 21, 1982, but was also obligated to exercise reasonable care regarding the designs and to return them to the Debtor at the expiration of the term. By failing to return the designs, Metro breached that duty, and is liable for damages to its bailor occasioned thereby.

■ 5. It would have been illegal for Metro, as a bailee, to have sold or transferred the designs to BAC on July 13, 1983, and any attempted sale or transfer would necessarily have been totally unauthorized.

■ 6. The position of both parties to the July 13, 1983, transaction was, however, that Metro did not attempt to make an unauthorized sale or transfer of the designs when it sold its assets to BAC, because the designs were not included in the transaction. Furthermore, the language of the Agreement of July 13, 1983, is ambiguous on the issue of whether the designs were in fact included in the sale, and this latent ambiguity is resolved by the agreement of the parties that they were not included therein.

7. There is no indication that the Runyans ever knowingly exercised any dominion or control over the designs at any time that they were in their possession. Therefore, the Runyans never become bailees of the designs at any time, nor are they liable to any party for having same in their possession at any time.

■ 8. Crystal did not become a good faith purchaser of the designs when the Runyans transferred the Waukegan facility to Crystal in the stock purchase agreement, because the Runyans never purchased the designs themselves and there is no indication that they received any consideration from Crystal for them.

9. Furthermore, Exhibit "A" to the Stock Purchase Agreement of September 18, 1985, which disclosed the Debtor's action against Metro to recover the designs in these very proceedings, suggests that Crystal had some knowledge that the Debtor had a claim to designs in its possession, and further adversely impacts upon the good-faith status of Crystal.

■ 10. Crystal is liable to Metro for its intentionally wrongful possession of the designs despite Metro's wishes that it return them to the Debtor from the date that Crystal became aware or should have become aware that it had possession of the designs, approximately one year ago, through the date of their recovery by the Debtor.

■ 11. The Debtor is entitled to recover from Metro the fair market value of the loss of use of the designs from the date that Metro was obligated to return the designs to the Debtor, August 21, 1982, to date. The reasonable value of the loss of the use of the 6,891 designs which have been located is $10.00 apiece, or $68,910.

■ 12. Metro has failed to meet its burden of proof, as a bailee, of establishing that the total loss of the remaining 2,727 designs was not due to its negligence or other wrongdoing, and therefore the Debtor is entitled to recover the fair market value of the 2,727 lost designs. The reasonable value of the designs lost is $20.00 apiece, or $54,540.00.

■ 13. On the first Count in the Complaint, Metro is therefore liable to the Debtor for $123,540.00, plus the sums previously awarded to the Debtor in sanctions ($1,646.50); the costs of the trip of the Debtor's agents to Waukegan less the $1,000.00 advanced by Metro; the costs of transporting the designs from Waukegan to the Debtor's facility; and any other costs of suit.

14. Crystal is liable over to Metro for the retention of the 6,891 designs in its possession for the past year, in which it has had them and knew or should have known that they were the property of the Debtor.

This liability is computed at $2.00 for the reasonable loss of the designs in the past year multiplied by the 6,891 designs retained, or $13,782.00. In addition, Crystal is liable over to Metro for the costs of the trip of the Debtor's agents to Waukegan, as this was rendered necessary only by the actions of Crystal in refusing to return the designs.

15. Except for Metro's liability to the Debtor, and Crystal's liability in part over to Metro, none of the parties have any liability to any of the other parties hereto with respect to the first Count of the Complaint.

■ 16. Metro is liable to the Debtor in the amount of $37,924.43 on the Second Count of the Complaint. We decline to award any pre-judgment interest to the Debtor because we believe that its own, overblown claims for approximately $1,500,000.00 on the First Count led to its delay in settlement of and hence receipt of the proceeds from this claim. *See In re Art Shirt Ltd.*, 68 B.R. 316, 325 (Bankr.E. D.Pa.1986).

■ On the other hand, we see no basis to reduce the Debtor's claim because Metro "relinquished its standing as an unsecured creditor" against the Debtor's estate by accepting the cards. If the cards were indeed "worthless," as Metro claimed, receipt of the cards would not have reduced its claim at all and it could have and should have gone ahead and filed a Proof of Claim simply to protect its interests. Hence, we perceive no logical reason why this set of circumstances should reduce the Debtor's claim for return of the value of a preferential transfer of the $37,924.43.

## D. DISCUSSION

■ As we observed in the Introduction to this Opinion, at page 718 *supra,* our somewhat elongated Conclusions of Law on certain points (see Nos. 1, 2, and 16 *supra* ) render our need for further discussion of these points unnecessary. We shall confine ourselves herein to discussion of relevant principles of property law and ascertainment of damages which lead us to the conclusions which we ultimately reach regarding Count One of the Complaint. We reiterate our belief that Pennsylvania law controls the interpretation of the First Agreement and Supplemental Agreement and that it is these documents which establish the relationship between the respective predecessors of the Debtor and Metro.

We reiterate most of the discussion included in our Memorandum of October 27, 1987, wherein we established that title and hence possessory right to the designs is in the Debtor as opposed to Crystal. However, we are flavoring this discussion with the Runyans' contention, joined by the Debtor in its Reply Brief, that the relationship between the parties was "a delivery ... of personalty under an ... express agreement that at the termination of the bailment the personalty will be redelivered to the bailor, ..." *American Enka Co. v. Wicaco Machine Corp.*, 686 F.2d 1050, 1053 (3d Cir.1982), *i.e.*, a bailment. *See also, e.g., English Whipple Sailyard, Ltd. v. Yawl Ardent*, 459 F.Supp. 866, 873 (W.D.Pa.1978); and *Sparrow v. Airport Parking Co. of America*, 221 Pa.Super. 32, 35, 289 A.2d 87, 89 (1972). This conclusion, if anything, weakens the position of Crystal, because it eliminates its status as a purchaser, let alone a "good faith purchaser," which is the basis of its tenuous claim to possession of the designs.

Our starting point remains "the well settled legal proposition that ordinarily when one buys and consumes chattels which belong to another he becomes a converter and must pay for his conversion regardless of his good faith." *First Camden Nat'l Bank & Trust Co. v. J.R. Watkins Co.*, 122 F.2d 826, 826–27 (3rd Cir.1941). *Accord, e.g., Textile Supplies, Inc. v. Garrett*, 687 F.2d 123, 127–28 (5th Cir.1982); *McMahon v. Sloan*, 12 Pa. 229, 230, 232 (1849); and 67 AM.JUR.2d 697 (1985). However, at this point, we are not even willing to accord Crystal the status of a good-faith purchaser.

Section 2–403 of the Uniform Commercial Code (hereinafter referred to as "UCC"), 13 Pa. C.S.A. § 2403, relied upon by Crystal, reiterates the principle recited

in *First Camden* generally, at § 2–403(1). However, that section further provides that "entrusting of possession of goods to a merchant who deals in good of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." UCC, § 2–403(2). Crystal relies particularly upon the application of this latter Code provision. However, a difficulty with an application of this section in favor of Crystal to the facts here is that, clearly, the sales by which Metro and the Runyans, respectively, in turn transferred virtually all of the assets of the Waukegan facility to the Runyans and Crystal were not transfers by a "merchant" in "the ordinary course of business."

The UCC's protection of good-faith purchasers dealing with merchants in their ordinary course of business is totally consistent with a generally-recognized common law exception of the application of the principle that even a good-faith purchaser's presence cannot enhance his rights beyond those of his transferor. That exception is that the owner may be estopped from denying the title of the unauthorized transferor of his property when he entrusts goods to one in a logical position to validly transfer them to another. *See* 67 AM.JUR.2d, *supra*, at 697–98. However, as a Pennsylvania case cited with approval by this text, *Hertz Corp. v. Hardy*, 197 Pa.Super. 466, 471, 178 A.2d 833, 836 (1962), points out, such "[e]stoppel must be established by clear, precise and unequivocal evidence ..." Thus, in factual circumstances comparable to those presented by the case at bar, owners have consistently succeeded in recovering their property from even parties who were, unmistakeably, good-faith purchasers. *See Mackay v. Benjamin Franklin Realty & Holding Co.*, 288 Pa. 207, 210–11, 135 A. 613, 614 (1927) (estate of late architect who left plans to erect a modernized hotel in the old hotel entitled to recover them from successor-architect); *McQuale v. North American Smelting Co.*, 208 Pa. 504, 57 A. 984 (1904) (tenant entitled to recover metal plates left in the basement of the premises of its former landlord); *Miller Piano Co. v. Parker*, 155 Pa. 208, 26 A. 303 (1893) (owner-lessor of piano entitled to recover it from good-faith purchaser of the piano from the lessee); *McMahon, supra* (owner of horse entitled to recover it from person who innocently purchased it from the owner's son, who frequently used it); and *Hertz Corp., supra* (owner-lessor of automobile entitled to recover it from good-faith purchaser from used-car dealer whose chain of title, though several times removed, could be traced to the lessee).

Crystal failed utterly to meet its stiff burden of proving estoppel by clear, precise, and unequivocal evidence. The circumstances suggest that the Debtor failed to demand the designs from Metro sooner only due to the severe contraction of its operations and consequent confusion of its affairs resulting from the filing of an involuntary bankruptcy case against it. Crystal therefore cannot prevail against the Debtor, who was the true owner-lessor of the designs and, like the plaintiffs in the above cases, had leased or given property to the respective defendants' vendors in bailment relationships.

The fact that the transfers of the contents of the Waukegan facility from Metro to the Runyans and from the Runyans to Crystal may have been bulk sales within the scope of Article 6 of the UCC does not aid the cause of Crystal. No provision of Article 6 appears calculated to give purchasers in bulk sales any rights superior to purchasers generally. Bulk sales are by definition transfers out of the "ordinary course of business" and beyond the scope of § 2–403(2) of the UCC. Hence, the general rule that the purchaser receives no greater rights than his transferor would certainly appear to apply to a bulk sale transaction.

Our conclusion that a bailment existed reinforces our conclusion that Metro had no right to retain the designs and therefore was totally incapable of transferring them to BAC and the Runyans in the July 13, 1983, transaction, as was GCI incapable of transferring the designs to Crystal in the transaction of September 18, 1985.

In a careful analysis of the precise terms utilized in the July 13, 1983, transaction, some of which we quoted at Finding of Fact 12, page 720 *supra*, Metro argues that the designs were properly categorized as neither "fixed assets," nor "fixtures," nor "equipment," and that the "inventories" transferred expressly consisted of "greeting cards," not "designs." Metro hence vigorously argues that it never purported to include the designs in the transaction of July 13, 1983. Since the inclusion of the designs in the transaction would have constituted blatant thievery of the designs, we are unwilling to lightly attribute such an intent to it.

On the other hand, the Runyans argue as vigorously as Metro that they never considered themselves to be purchasing the designs in this transaction. Since the written Agreement memoralizing the July 13, 1983, transaction is at best ambiguous on the point, we are at a loss to identify any source more reliable than the unanimous consensus of the parties to the contract to establish that the designs were in fact not meant to be included in this transaction. Even the testimony of Crystal's bellwether Splayt supports the arguments of Runyans and Metro on this point. Splayt contends that, as of July 13, 1983, he was totally unaware of the presence of the designs in the Waukegan facility. We do not believe that a valuable commodity, the presence of which was unknown to the party serving as a go-between in the sale negotiation process, should be considered to be included in the sale, especially when the seller was merely a bailee of the said commodity.

We therefore retract that portion of our Memorandum of October 27, 1987, in which we cite to *Hertz Corp.* as a paradigm for resolving the claims between Metro and its subsequent transferees, particularly that passage where we suggested that Crystal was entitled to seek redress from their transferee, the Runyans, and the Runyans in turn "on back to the defrauding party." 197 Pa.Super. 477, 178 A.2d at 839. Although the *Hertz Corp.* case could have been analyzed as a bailment, and each party in the transfer chain there appears to have been as innocent as the Runyans, at least each party in the chain there knew that it had possession of the particular automobile which was in fact owned by the plaintiff. Here, until the identity of the designs emerged in late 1986, the parties in the transfer chain were, per the testimony of their own agent Splayt as well as their arguments at this juncture, oblivious to their possession of the designs.

The absence of knowledge of the presence of the designs in the Waukegan facility is, as the Runyans suggest, highly relevant to a bailment analysis. A delivery is a prerequisite to a bailment. *See American Enka, supra,* 686 F.2d at 1053. "There can be no bailment without delivery of the subject matter of the bailment," *International Electronics Co. v. N.S.T. Metal Products Co.,* 370 Pa. 213, 220, 88 A.2d 40, 44 (1952), and acceptance of possession of the property allegedly bailed, including exercise of "custody and control over it," is prerequisite. *Riggs v. Commonwealth Dep't of Transp.,* 76 Pa.Cmwlth. 227, 230–31, 463 A.2d 1219, 1220 (1983). *See also Sparrow, supra,* 221 Pa.Super. at 35–36, 289 A.2d at 89; and 8 AM.JUR.2d 802–03 (1980).

Therefore, the Runyans, and, at the outset of its ownership of the Waukegan facility, Crystal as well, were not bailees of the designs. The status of Crystal did not change until late 1986, when the designs were discovered to be located in the Waukegan facility. After that date, Crystal engaged in "a distinct act of dominion wrongfully exerted over another's personal property in a denial of" the title of the Debtor, thus converting the designs. 18 AM. JUR.2d 145 (1985). Since it persisted in retaining the designs over the entreaties of Metro that it return the designs to the Debtor, Crystal became primarily liable for the Debtor's deprivation of the designs over the past year. Pennsylvania law, which controls all aspects of the bailment relationship created in the 1977 and 1979 agreements, does recognize the concept of implied indemnity in such circumstances, *see, e.g., Globe Indemnity Co. v. Agway, Inc.,* 456 F.2d 472, 474–75 (3rd Cir.1972); *TVSM, Inc. v. Alexander & Alexander,*

*Inc.*, 583 F.Supp. 1089, 1090–92 (E.D.Pa. 1984); *Jones & Laughlin Steel Co. v. Johns-Manville Sales Corp.*, 453 F.Supp. 527, 540 (W.D.Pa.1978), *rev'd in part on other grounds*, 626 F.2d 280 (3d Cir.1980); and *Embrey v. Borough of West Mifflin*, 257 Pa.Super. 168, 185, 390 A.2d 765, 774 (1978), as apparently is not the case under the present law of Illinois. *See Heinrich v. Peabody International Corp.*, 139 Ill.App. 3d 289, 93 Ill. Dec. 544, 549–53, 486 N.E.2d 1379, 1384–88 (1985).

■■■ Having established that Metro was a bailee of the designs also establishes its liability for the Debtor's permanent loss of ·the 2,727 missing designs and the loss of the use of the 6,891 designs which, barring further unwarranted interference from Crystal, the Debtor will soon recover. It is established that the designs were not returned to the Debtor at the end of the license period or upon demand. The burden was therefore cast upon Metro, as a delinquent bailee, to come forward with evidence of due care in order to avoid liability. *See American Enka, supra*, 686 F.2d 1053; *Western Mining Corp. Ltd. v. Standard Terminals, Inc.*, 577 F.Supp. 847–50 (W.D.Pa.1984), *aff'd*, 745 F.2d 49 (3d Cir. 1984); *Engligh Whipple*, 453 F.Supp. at 873; *Girard Trust Corn Exchange Bank v. Brinks, Inc.*, 422 Pa. 48, 53–54, 220 A.2d 827, 830 (1966); *Fidelman-Danziger, Inc. v. Statler Management, Inc.*, 390 Pa. 420, 136 A.2d 119, 123 (1957); and 8 AM. JUR.2d, *supra*, at 1057–59.

Metro has failed to provide any explanation as to what happened to the 2,727 designs which have been lost, nor any justification for failure to deliver the 6,891 designs which have been located, at the termination of the license period. Therefore, Metro is liable to the Debtor for the loss of use of the designs for the past five years and the value of the designs which have been lost. *See American Enka*, 686 F.2d at 1054–55; *Baram v. Farugia*, 606 F.2d 42, 43–44 (3d Cir.1979); and *Welded Tube Co. of America v. Phoenix Steel Corp.*, 512 F.2d 342, 345 (3d Cir.1975). These liabilities to the Debtor are subject to indemnity from Crystal for the last year of

the loss of use of the 6,891 designs in its possession, since Crystal is primarily liable for the loss of use over that period. The only remaining issue is how we should measure the loss of use of the designs and the value of those that have been lost entirely.

It is possible to fill the air with generalities regarding the measurement of damages. We do not, however, believe that a great deal more can be set down which will be useful to us in addition to the following statement made by us on this topic in *In re Humphrey's Pest Control Co., Manes v. France*, 80 B.R. 687, 697 (Bankr.E.D.Pa. 1987):

Our beginning point is the truism that the plaintiff always has the duty of establishing damages by proper evidence. *See, e.g., Gordon v. Trovato*, 234 Pa.Super. 279, 282, 338 A.2d 653, 654 (1975). While the plaintiff's burden is merely to prove damages with "reasonable certainty," *see In re Chapman*, 77 B.R. 1, 6 (Bankr.E.D.Pa.1987), it is essential that the plaintiff establish the fact of damages, as opposed to the precise amount of damages, the computation of which does allow a court some discretion in favor of the plaintiff. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 [51 S.Ct. 248, 250, 75 L.Ed. 544] (1931). *See also Keystone Floor Products Co. v. Beattie Mfg. Co.*, 432 F.Supp. 869, 880–82 (E.D.Pa.1977); and *Taylor v. Kaufhold*, 368 Pa. 538, 546, 84 A.2d 347, 351 (1951).

Here, clearly, the Debtor has suffered damage due to the deprivation of the use of all 9,816 designs subject to the license Agreements and the permanent loss of 2,727 of them. Such damages "need not be proved with mathematical certainty, only reasonable certainty." *E.C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324, 357 (3d Cir. 1980).

■■■ Metro faults the Debtor for contributing to its own losses by not making duplicates of the licensed designs, as was the industry practice, and for not discovering Metro's failure to return them sooner. However, "[t]he burden of proving

that losses could have been avoided by reasonable expense must be borne by the party who has broken the contract." *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 529 (3d Cir.1978). Since our measure of damages results in a relatively modest figure, we perceive no just basis to reduce it on account of the debtor's alleged contributory negligence. We accept Coffey's explanation that the cost of duplicating the designs, which we hold to be the equivalent of their value of $20.00 apiece, would have been prohibitive. This conclusion, of course, renders us unwilling to value the designs as liberally as the Debtor would have us do so now, because the Debtor simply did not treat them as if they were as valuable as it now claims. Also, we agree that the bankruptcy filing against the Debtor and its consequent dramatic contraction in personnel explained its overlooking the Metro Greetings contract and the failure of Metro Greetings to return the designs pursuant to it for about a year and a half. Metro Greetings' own financial problems undoubtedly explain its failure to return the designs, but it, as the wrongdoer, can scarcely expect this Court to make allowances for it.

■ We attribute little, if any, weight to the deposition testimony of Messrs. Smith and Wolfe. The depositions, intended as discovery and at which nearly all of the questioning was from Metro's counsel, provided little insight into how Messrs. Smith and Wolfe arrived at their valuation figures. The combination of their absence from the hearing to present live testimony and foundation for their opinions, *see In Re Chandler*, 77 B.R. 513, 517 (Bankr.E.D.Pa. 1987) (appraisal report of absent expert discounted), and the fact that they had never seen the designs in issue, *see McFarland v. Gregory*, 425 F.2d 443, 448 (2d Cir.1970) (expert whose opinion revealed ignorance of basic underlying facts dismissed), severely weakens the value of their testimony. While we might have excused the Debtor's failure to arrange for these witnesses to observe the designs in issue when their locus was unknown and unknowable due to Metro's negligence, which appeared to be the case as of the time that the depositions were taken in June and July, 1986, the fact that the Debtor was not able to produce an expert who had seen them after their discovery does not permit us to draw any inferences favorable to the Debtor on this point.

■ On the other hand, we are unwilling to accept Metro's calculations which suggest that the designs were virtually worthless. There is no evidence that the Debtor's modest profit from its film library in its troubled post-confirmation era was indicative of the actual loss of use or value of these particular designs, which were, of course, absent from its library during the period in issue.

We therefore conclude that the best measure of the loss of use of these particular designs can be deduced from the only evidence of which we are aware that involved valuation of these designs themselves, i.e., the First Agreement and Supplemental Agreement of 1977 and 1979 by which the designs were licensed for $10.00 for, ultimately, a period of five years. The Debtor was obviously willing to let them go at this figure, and even granted Metro's predecessor an extension of the period of use and the period in which to submit payments. These factors suggest that these particular designs were not among the finest in the United States, which finding was the bases of the respective valuations by Messrs. Smith and Wolfe. On the other hand, Metro Greetings did ultimately make all of the license payments in a period in which it was just emerging from financial difficulties, and therefore it is apparent that the designs were worth the license price to it.

We therefore believe that our reliance on the First Agreement and Supplemental Agreement is fair and strikes the desideratum of a middle ground. We observe that our evaluation is consistent with the Debtor's own evaluation of its other designs at approximately $10.00 apiece at the Confirmation hearings. Our precise calculations, set forth in Findings of Fact 30–32, page 721 *supra*, and Conclusions of Law 11–14, pages 723–24 *supra*, need not be repeated here.

We therefore believe that no further explanation of our following Order is necessary.

## ORDER

AND NOW, this 15th day of December, 1987, upon consideration of the record made at the trial of this matter on August 11, 1987, August 27, 1987, and October 22, 1987, and the respective parties' Briefs, it is hereby ORDERED AND DECREED as follows:

1. THE CRYSTAL GROUP OF COMPANIES ("Crystal") shall forthwith allow the designee of METROPOLITAN CONSOLIDATED INDUSTRIES, INC. ("Metro"), *i.e.,* the Debtor, WINDSOR COMMUNICATIONS GROUP, INC., T/A NORCROSS–RUST CRAFT GREETING CARD PUBLISHERS, to recover the 6,891 greeting cards designs identified as belonging to the Debtor at Crystal's facility in Waukegan, Illinois, as per our Order of October 27, 1987, forthwith.

2. Judgment is entered in favor of the Debtor against Metro, in the amount of $161,374.43, plus (1) The sum of $1,646.50 previously awarded to the Debtor as sanctions, (2) The reasonable costs of the trip of the Debtor's agents to Waukegan pursuant to our Order of May 22, 1987, less the $1,000.00 advanced by Metro, (3) The reasonable costs of transportation of the designs from Waukegan to the Debtor's facility, and (4) Any other reasonable costs of suit.

3. Judgment is entered in favor of Metro against Crystal in the amount of $13,-782.00, plus item (2) of the costs designated in paragraph two *supra,* plus the $1,000.00 advanced to the Debtor by Metro.

4. Any claims by any other parties against each other not mentioned in paragraphs one, two, or three *supra* are DENIED and DISMISSED.