In re REPCO PRODUCTS CORPORATION, Debtor.

REPCO PRODUCTS CORPORATION, Plaintiff,

v.

RELIANCE ELECTRIC COMPANY, Defendant.

Bankruptcy No. 83–02074S.
Adv. No. 84–0763S.

United States Bankruptcy Court, E.D. Pennsylvania.

May 8, 1989.
As Amended June 22, 1989.

---

Stephen M. Felman, J. Craig Currie, Philadephia, Pa., Nathan B. Feinstein, Piper & Marbury, Baltimore, Md., Lawrence G. McMichael, Philadelphia, Pa., for debtor.

Joel Gusky, Philadelphia, Pa., for defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

This long-pending adversary proceeding is a breach of warranty suit brought by REPCO PRODUCTS CORPORATION (hereinafter "the Debtor"), a supplier of residential heating boiler units, against the Defendant, RELIANCE ELECTRIC COMPANY (hereinafter "the Defendant"), a division of which manufactured castings used in the units. The Debtor seeks damages of $479,839.13, plus interest, which allegedly arose when the Defendant's breaches of warranties proximately caused a substantial number of the boilers to crack and leak after installation. We conclude that the principal reason for the cracking was that the Defendant, innocently but erroneously, altered the plans for the boiler units by introducing a "step" on certain of the castings, and therefore did breach its warranties in the manufacturing process.

However, due to the failure of the Debtor, as well as the Defendant, to discover the error in manufacturing or to terminate the parties' relationship at any earlier stage despite the persistence of the leak problem, we believe that damages should be restricted to only those elements clearly

established in the record. We shall allow to the Debtor only those elements of damages directly associated with replacing cracked boiler units, which total $208,555.52. However, we shall disallow all of the other elements claimed. These include sums which a purchaser of the Debtor's sales distribution, Vaillant Corporation (hereinafter "Vaillant"), offset in a settlement with the Debtor ($113,000), which the Debtor failed to show related directly to the Defendant's actions. It also includes amounts which Vaillant, succeeding to the Debtor in servicing its boilers, expended to replace cracked boilers ($56,438.29), as the Debtor has not sufficiently established that these costs were actually passed on to the Debtor. We also shall not allow a claim for costs of increased testing ($15,000), as this figure is not quantified in the record. In addition, we do not think that the Debtor has sufficiently shown the justification to impose a cost of a program to recall certain of the boilers ($86,845.32) against the Defendant. Finally, we will also allow the Defendant to set off the cost of its product which the Debtor accepted, but for which it failed to pay, amounting to $187,408.18. As we further conclude that no award of pre-judgment interest to either party is appropriate, the net award to the Debtor is reduced to $21,147.34.

## B. PROCEDURAL HISTORY

On May 17, 1983, the Debtor filed the bankruptcy case underlying this proceeding under Chapter 11 of the Bankruptcy Code and thereafter operated its business as a debtor-in-possession. The Debtor's Plan of Reorganization, contemplating a ten (10%) percent dividend to unsecured creditors, was confirmed on May 14, 1984.

On January 6, 1984, the Columbiana Pump Division of the Defendant (referred to herein interchangeably with the Defendant as "the Defendant"), began the proceedings between the parties *inter se* in this court. It filed a proof of claim in the amount of $200,524.11, which allegedly represented the charges for all castings produced by the Defendant on behalf of the Debtor subsequent to June 4, 1982. On March 6, 1984, the Debtor filed an Objec-

tion to the Defendant's proof of claim, due to the warranty claims in issue here. That objection itself was never decided, having been continued generally on April 13, 1984, by our predecessor, the Honorable William A. King, Jr., possibly in contemplation of the filing of this adversary proceeding as a means to resolving the differences between the parties.

On July 19, 1984, the Debtor did file the complaint in the instant adversary proceeding. The Defendant responded, on October 15, 1984, by filing an Answer containing the substance of its proof of claim as a counterclaim to the Debtor's Complaint in this proceeding.

Judge King approved Stipulations generally extending the time for pleading and the trial date, and the matter had disappeared from the court's calendar by the time that we succeeded him on August 27, 1986. The parties, meanwhile, unknown to us, were engaging in a leisurely discovery process. On May 19, 1988, the Defendant filed a motion to compel discovery which, while withdrawn, brought this proceeding to our attention. We then *sua sponte* issued a Pre-trial Order on June 16, 1988, which, *inter alia*, set the trial date for August 23, 1988. As the result of a mutual request for a continuance by the parties, the trial date was rescheduled for September 13, 1988, with the warning that no further continuances would be granted.

Nevertheless, on August 10, 1988, the Defendant filed a motion requesting a further continuance of the trial until December 12, 1988. This court, adhering to its original warning, denied the request. The trial was conducted on full days on September 13 and 14, 1988, and a short session of rebuttal testimony on September 16, 1988. At the conclusion of the trial, the parties were instructed to file proposed findings of fact, proposed conclusions of law, and briefs by specified dates, which contemplated complete submission of the proceeding to us by February 7, 1989. On December 8, 1988, the Plaintiff requested and was granted an extension of time to begin the submission process. All materials were in

fact completed and filed by February 21, 1989.

Since this proceeding involved protracted and disputed testimony, we are obliged to prepare our decision, pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7052 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 52(a), in the form of findings of fact and conclusions of law. Our conclusions of law appear as headnotes to subsequent discussions of each legal issue.

## C. FINDINGS OF FACT

1. The Debtor is a Pennsylvania corporation which, since 1945, has manufactured residential heater boiler units, which were sold by it to principally plumbing supply wholesalers for resale to plumbing contractors.

2. The Defendant, through its foundry division, Columbiana Pump, is in the business of manufacturing and selling cast-iron castings, and has been doing so for customers in the boiler industry since 1953.

3. In 1979, an engineer then employed by the Debtor, Charles Gordbegli, contacted the Defendant for the purpose of engaging the Defendant to manufacture castings for the Debtor's boilers.

4. Prior to this time, the Debtor had been supplied with complete boiler units or "blocks" by two manufacturers, Pentex and Dunkirk Radiator (hereinafter "Dunkirk"). However, it had discontinued its relationship with Pentex, principally due to excessive (20 to 30 percent) cracking in units manufactured by Pentex, and it desired to have more than one supplier at any point in time to guard against production stoppage due to difficulties which a particular supplier might encounter in its own manufacturing processes.

5. By way of contrast to the supplying of complete blocks of castings utilized in its boilers by Pentex and Dunkirk, the Defendant supplied only individual parts of the block. These parts consisted of three types of castings, left-hand castings, intermediate castings, and right-hand castings. After the Debtor received the Defendant's castings, the Debtor itself would assemble a right-hand casting, a left-hand casting, and a number of intermediate castings varying between zero and five, depending on the boiler's size, into a block. The castings making up a block were held together with, *inter alia*, tie rods and bolts.

6. In order for the Defendant to begin production of the individual castings which it was to assemble, the Debtor supplied the Defendant with three blueprint drawings and a master pattern which were to be used to manufacture, respectively, the right, left, and intermediate sections. The drawings were created by an engineer employed by the Debtor, Larry Schmidt, who did not testify at trial.

7. Several months prior to entering into a formal agreement to manufacture the castings in accordance with the drawings, the Defendant sent the Debtor samples of the left, intermediate, and right sections which it had created from the blueprints.

8. On November 6, 1979, the samples sent to the Debtor by the Defendant were approved and the parties entered into an agreement for their mass production thereafter.

9. All assembled boilers were subject to testing pursuant to standards established by the American Gas Association (hereinafter "AGA") and the American Society of Mechanical Engineers Code (hereinafter "ASME"). The ASME Code governs, among other things, the chemical composition of the castings and various pounds per square inch of pressure levels which the castings must withstand.

10. Both the Debtor and the Defendant analyzed the metal used in the castings and in the finished blocks. The Debtor initially performed a visual inspection of the castings for any obvious holes or cracks and, after preparing those not obviously damaged for plumbing, filled them with water and pressurized them in checking for any leaks.

11. In 1981, the Debtor began experiencing what it believed were an inordinate number of instances where the Defendant's castings were cracking. Therefore, the

Debtor instituted a second pressure test using air.

12. When the Defendant's agents observed the air-pressure testing in a visit to the Debtor's plant in October, 1981, they strongly disapproved of this test, principally because of the potential dangers which its administration presented to the Debtor's workers performing these tests.

13. The Debtor nevertheless continued the tests, and only after the castings had passed all of the above-mentioned tests were they assembled into boilers.

14. In March, 1981, the parties agreed to alter the method of securing the units together in the block, utilizing four tie-rods instead of two tie-rods. The parties dispute who made the suggestion first, but they both agreed to this change.

15. Throughout 1981 and into 1982, the portion of units containing the Defendant's castings which cracked steadily increased. Also, the Debtor began to fall behind in making payments for its product to the Defendant.

16. In January, 1982, the parties met and discussed principally the quality-control problem, and both agreed to and did make efforts to determine what was causing the cracking. In August, 1982, the parties met again and principally discussed the payment problem. The Debtor agreed to pay an outstanding debt of about $80,000 in three installments, by November, 1982.

17. On November 2, 1982, the Debtor entered into an exclusive Distributor Agreement with RPC Sales Corp., the predecessor of Vaillant. This Agreement thereafter placed the Debtor's entire sales operations totally in the control of Vaillant.

18. The installments payments which the Debtor had promised to pay on the outstanding debt were apparently not made. Instead, on December 1, 1982, the Debtor telegraphed the Defendant and stated that, due to the quality-control problems, the Defendant should not ship any additional castings to the Debtor until these problems were solved.

19. In February, 1983, the Defendant sent their metallurgist, James Ward, to the plant where the castings were made to attempt to determine the cause of the cracking, and he conducted a series of tests.

20. For several months thereafter, communications continued between the parties. However, no one, including Ward, was able to identify the cause of the cracking with any degree of certainty, and the contractual relationship between the parties was never resumed.

21. Out of approximately 15,000 units in which boilers manufactured by the Debtor which contained the Defendant's castings were produced during the parties' relationship, about 600, or four (4%) percent, cracked.

22. In January, 1983, the Debtor, claiming that it was continuing to receive a large number of complaints regarding units manufactured by the Defendant, commenced a program whereby it recalled 259 of the boilers.

23. On May 17, 1983, the Debtor, which was apparently winding down its operations in any event, filed the instant bankruptcy case.

24. In August, 1983, the Defendant informed the Debtor that it was going to bill the Debtor for the remaining inventory which the Defendant had produced pursuant to the parties' relationship prior to December 1, 1982, but had not shipped to the Debtor per its refusal to accept same.

25. The Defendant billed the Debtor $200,523.71 for shipments since June 4, 1982. This sum included a $266.70 for a shipment on December 17, 1982, and, an entry of $12,848.83 was made as of August 11, 1983, the date that the Debtor refused the final shipment.

26. On January 6, 1984, the Defendant filed a proof of claim in the amount of $200,524.11 in the Debtor's bankruptcy case which, as noted, has never been resolved. The Defendant filed a counterclaim in this proceeding in the amount of $200,523.71, an amount precisely correlating with its bill. The Defendant did not

justify the $.40 discrepancy in making its proof of claim.

27. In preparation for trial of this case, the Debtor hired Dr. George A. Smierow, professor emeritus of materials engineering at Drexel University. By examination of two of the Debtor's units containing castings manufactured by the Defendant, Dr. Smierow concluded that certain metallurgical and technological deficiencies in the manufacturing of the castings led to the cracking of the boilers.

28. The Debtor, however, chose not to call Dr. Smierow as a witness. His report of August 15, 1985, to the Debtor was admitted into the record by agreement of the parties only due to the Defendant's insistence that it be admitted after its offhand mention by the only expert called at trial by the Debtor, Dr. Campbell Laird, professor of material science and energy at the University of Pennsylvania.

29. Dr. Laird was hired by the Debtor in March, 1986. On April 29, 1987, Dr. Laird furnished the Debtor with a report delineating what he thought was the cause of the defect.

30. At trial, consistently with the report, Dr. Laird testified that a doctoral student working on the project identified only as "Hong," had discovered that the left-hand and intermediate casting manufactured by the Debtor contained slight inclines or "steps." These steps, according to Dr. Laird, caused the mating surfaces of the castings to be uneven and, when subjected to force, caused the castings to crack in inordinate numbers. Dr. Laird further stated that the change of the casting design in March, 1981, including four instead of two tie-rods, had exacerbated this problem.

31. Dr. Laird further stated that he believed that the introduction of the steps was a "subtle problem," thus explaining the difficulty of its detection.

32. The original contention of the Defendant's metallurgist Ward was that improper, uneven torquing or tightening of the castings by the Debtor caused the cracking. Although he continued to contend that the Debtor's torquing contributed to the cracking, Ward agreed at trial that the presence of the steps was the primary cause of the cracking and that he had never discovered the presence of the steps himself despite his studies of the problem.

33. The Defendant's plant manager in the beginning of the process to manufacture the castings, when the steps were introduced into the process, was Vincent Horning. Horning testified that the steps were placed on the castings because the Debtor's blueprints included them.

34. Stating his age as "70 plus" and testifying that he had been retired for over seven years at the time of trial, Horning became confused during cross-examination. He identified a marking on the blueprints which he contended called for a step on the right-hand castings, which the Defendant had not manufactured with steps. However, Horning was very experienced as a foundry supervisor and blueprint-reader and was doubtless more alert during the time of his employ than at the time of trial. Therefore, we conclude that Horning reasonably believed, at the time of manufacture, that the drawings called for steps on the castings on which they were placed.

35. Dr. Laird, in rebuttal as well as his direct testimony, stated unequivocally that the markings which Horning claimed constituted steps on the blueprints were included on the drawings for another purpose, i.e., designating places where the rounded end of the casting ended and a straight tangent-line began on the drawings. Therefore, he claimed that none of the blueprints called for the inclusion of the steps.

36. Weighing the clear expert testimony of Dr. Laird against the somewhat-confused yet practical testimony of Horning, and noting that even Ward conceded that Dr. Laird had arrived at the correct hypothesis as to the cause of the cracking of the castings, we credit on Laird's entire testimony and conclude that none of the blueprints actually included steps and that the Defendant, in placing steps on the castings, erred. However, the error was, as indicated, subtle and innocent.

37. The Debtor presented documentation supporting its expenditures of $208,-555.52 [1] for replacing cracked boilers having castings supplied by the Defendant. Although the Defendant questioned several of the calculations of the per-unit costs of replacing the boilers, particularly the labor costs, we conclude that the per-unit costs claimed by the Debtor were reasonable in all respects.

38. The Debtor also claimed the following respective elements and amounts of damages:

a. Reimbursement for release of a claim of $113,000 which Vaillant had made against the Debtor under warranty provisions in the November 2, 1982, Distribution Agreement. This claim was attributed to the Debtor's warranty problems with the Defendant. The only proof of this element of damages was a letter of April 2, 1984, between counsel for the Debtor and for Vaillant confirming an agreement to set off the $113,000 against a $112,222.86 claim that the Debtor had against Vaillant.

b. Damages of $56,438.29, reflecting the amounts for which Vaillant, after assuming the exclusive distributorship of the Debtor's products, issued credit memoranda to customers computed by the same per-unit formula as the calculations reflected in paragraph 37 *supra*. There is, however, no statement in the record as to when and how these charges were assumed by the Debtor.

c. $86,845.32 expended in the 1983 post-Vaillant program of the Debtor by which it recalled 259 boilers including the Defendant's castings.

d. An amount of $15,000 which was claimed, by the Debtor, to be "at least" the costs of the additional air-pressure testing. No documentary nor testimonial evidence was presented in support of cost-component in the record.

## D. CONCLUSIONS OF LAW/DISCUSSION

### 1. THIS COURT HAS JURISDICTION TO HEAR AND DETERMINE THIS MATTER

The instant matter is an adversarial proceeding which takes the form of a relatively complex affirmative action instituted by a Debtor arising out of pre-petition events. As such, it is clearly related to the Debtor's bankruptcy case and hence jurisdiction for it to be heard in the bankruptcy court is within the scope of 28 U.S.C. § 1334(b).[2]

Although the Complaint takes the form of a counterclaim to a proof of claim, and hence is classifiable as a core proceeding which we can determine under 28 U.S.C. §§ 157(b)(1) and (b)(2)(C), the parties have not designated it as such. However, any question as to whether we were empowered to determine as well as hear it was eliminated by counsel's express agreement at the close of the trial that we could determine it. *See* 28 U.S.C. § 157(c)(2); and *In re Frymire*, 96 B.R. 525, 528 & n. 2 (Bankr.E.D.Pa.1989), *motion to withdraw reference denied*, Misc. No. 89–61 (E.D.Pa.

---

1. These costs included several components, as follows:

| | |
|---|---|
| 59 boilers returned after September 30, 1982 for which the Debtor had receipts— | $ 41,183.16 |
| 26 boilers returned from January 1, 1982, to September 30, 1982 for which the Debtor had receipts— | 18,807.32 |
| 184 boilers returned after September 30, 1982 for which the Debtor had no receipts— | 24,128.28 |
| 140 boilers returned from January 1, 1982, to September 30, 1982 for which the Debtor had no receipts— | 105,712.13 |
| 55 castings which cracked "in the field" during the entire time period— | 18,724.63 |
| | $208,555.52 |

2. The pleadings and the parties' Stipulation of Facts cites to former 28 U.S.C. § 1471, which was repealed and replaced by 28 U.S.C. § 1334(b) on July 10, 1984, nine days before the institution of this proceeding. We therefore conclude that this proceeding is controlled by the present jurisdictional scheme fashioned in the July 10, 1984, amendments to bankruptcy law.

Feb. 14, 1989). We shall therefore determine it.

### 2. THE DEFENDANT'S ERRONEOUS INTRODUCTION OF STEPS INTO THE MANUFACTURE OF CERTAIN OF THE CASTINGS CONSTITUTED BREACH OF WARRANTIES

#### a. THE INCLUSION OF STEPS ON THE CASTINGS DID NOT CONFORM TO THE BLUEPRINTS

■ Our factual finding that the blueprints of the castings did not call for the inclusion of the steps which the Defendant affixed on the left and intermediate castings is amply supported by evidence in the record and is in itself decisive of the issue of whether the Debtor breached warranties in the manufacture of the castings. Contrary to the Defendant's contentions, Dr. Laird's expertise in reading blueprints was clearly established in this record. The Defendant countered with no expert testimony at all on this point, but merely presented the fact testimony of its aged former plant manager Horning in rebuttal.[3] Horning, perhaps due to his advanced age and retirement from his work encompassing the underlying matters in issue for several years, became confused on the stand, identifying the right-hand casting-drawing as calling for the step rather than the left-hand, where it had been included. Although the confusion as to which drawing was which was consequently understandable, it was nevertheless difficult for us to understand why a step was included on one side of the castings but not on the other when no reason for a distinction appeared.

In sum, while we concluded that the Defendant's placing steps on the left-hand and intermediate castings was innocent and not totally unreasonable, it was nevertheless an error on its part.

#### b. THE GENERAL ELEMENTS OF A BREACH OF THE EXPRESS WARRANTY HAVE BEEN ESTABLISHED

The Debtor alleges that the Defendant breached the express warranty, the implied warranty of merchantability, and/or the implied warranty of fitness for a particular purpose in its placing the steps on the castings as it did. It is clear that, under the admittedly-controlling Pennsylvania law, a single contract may contain all three types of warranties. *General Instrument Corp. v. Pennsylvania Pressed Metals, Inc.,* 366 F.Supp. 139, 146 (M.D.Pa.1973), *aff'd,* 506 F.2d 1051, 1052 (3d Cir.1974). Therefore, we will address each type of warranty, although, since a violation of more than one has the same consequences as a breach of any one, we will concentrate on one type of warranty, *i.e.,* the express warranty. There is no doubt that the Defendant is a merchant within the applicable Pennsylvania Uniform Commercial Code (hereinafter "UCC"), 13 Pa.C.S. § 2104, and there was no serious contention at trial that the Defendant excluded or modified any warranties.[4]

The parameters of an express warranty are set forth as follows in 13 Pa.C.S. § 2313:

§ 2313. Express warranties by affirmation, promise, description or sample

(a) General rule.—Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty

---

**3.** We decline the invitation of the Defendant to draw any adverse inference from the Debtor's failure to call Larry Schmidt, the draftsman of the blueprints for the Debtor, as its witness. There is no evidence that Schmidt remains in the control of the Debtor or was not equally available or unavailable to both parties. *See United States v. Busic,* 587 F.2d 577, 586–87 (3d Cir.1978), *rev'd on other grounds,* 446 U.S. 398,

100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *Atlantic Sugar, Ltd. v. United States,* 553 F.Supp. 1055, 1059, 4 C.I.T. 248 (1982); *In re Huderson,* 96 B.R. 541, 550 (Bankr.E.D.Pa.1989); and *Rosenthal v. Ostrow,* 287 Pa. 87, 91, 134 A. 384, 385 (1926).

**4.** *But see* page 197 n. 6 *infra.*

that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(b) Formal words or specific intent unnecessary.—It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the opinion of the seller or commendation of the goods does not create a warranty.

The Defendant does not dispute that there is an express warranty. However, it contends that the express warranty was created by sample, since it presented a sample of the castings including the offending steps to the Debtor at the outset of the process, and not by affirmation or description. The Debtor, meanwhile, simply contends that the Defendant agreed to produce castings which were in accordance with the Debtor's specifications and, the AGA requirements, and the ASME Code and that, by producing castings which included the confounding steps in its manufacturing process, the Defendant breached the express warranty.

Looking to the Comments to § 2313, it is readily apparent that the Debtor's analysis is correct. Express warranties rest on "dickered" aspects of an individual bargain and clearly go to the essence of that bargain. Furthermore, § 2313(b) makes clear that it is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee." Comment 5 further adds that technical descriptions, such as *blueprints*, can afford a more exact description than mere language and, if conformity thereto is made part of the basis of the bargain, the goods produced must conform to the blueprints. The facts of the instant case clearly demonstrate that the Defendant was supplied blueprints by the Debtor. By accepting the blueprints as the precise basis for how the castings should be produced, the Defendant warranted that castings manufactured would adhere precisely to the specifications therein. By introducing steps which were not on the blueprints into the manufacturing process, the Defendant breached the express warranty it made to the Debtor.

### c. THE TRANSACTION IN ISSUE IS NOT A "SALE BY SAMPLE"

█ Apart from a misplaced contention that this court should reject Dr. Laird's hypothesis because it is derived from a witness whose experiences have arisen from academia rather than experiences in a manufacturing plant, the Defendant's only other defenses of the Debtor's claim that it breached its express warranty are that (1) the instant transaction was a "sale by sample" and that the Defendant is not liable if it produced castings the same as the original samples, which included the steps; and (2) the steps, even if wrongly added to the castings, were not the proximate cause of their cracking. Both contentions must be rejected.

A "sale by sample" is a term of art, which "[p]ractically all the courts agree ... arises [only] where a sample is taken from the bulk of the goods and is held out to the buyer to be a fair example of what bulk of the merchandise consists of." Annot., *What Amounts to a "Sale by Sample" as Regards Warranties*, 12 A.L.R.2d 524, 528 (1950). *See, e.g., F.A.D. Andrea, Inc. v. Dodge*, 15 F.2d 1003, 1004–06 (3d Cir.1926); *Selser v. Roberts & Co.*, 105 Pa. 242, 246 (1884); and *Gordon v. Orbach*, 63 DAUPHIN CO. RPTS. 325, 328 (Dauphin Co.C. P.1952). Clearly, this is not a case where the Defendant displayed goods in bulk from which the Debtor chose a sample. Rather, there was no bulk of goods displayed and the sample was not originally in the seller's stock, but was a prototype of a product which had been manufactured according to specifications provided by the buyer.

The facts of this case are therefore unlike the "sale by sample" cases and are much more like those in *John E. Smith's Sons v. Lattimer Foundry & Machine*

*Co.,* 19 F.R.D. 379, 384–85 (M.D.Pa.), *rev'd on other grounds,* 239 F.2d 815 (3d Cir. 1956), which also involved the manufacture of castings. In that case, as here, the samples were manufactured pursuant to plans submitted by the buyer. The court found the warranties breached when the goods did not conform to the samples. 19 F.R.D. at 384–89. In no sense, did the court analyze the case as one involving a "sale by sample." *Cf. R.I. Lampus Co. v. Neville Cement Products Corp.,* 474 Pa. 199, 202, 378 A.2d 288, 289 (1977) (case not analyzed as involving a "sale by sample" even though the manufacturer was shown samples of defective concrete blocks in course of attempts to identify defects in manufacturing process).

We therefore decline to hold that the transaction involved a "sale by sample." The fact that the castings produced by the Defendant may have conformed to the samples, which it produced, which may have contained the same erroneously-conceived but undetected steps as the castings which later proved to be defective, does not protect the Defendant from liability.

d. THE PRESENCE OF THE STEPS WAS THE "PROXIMATE CAUSE" OF THE EXCESSIVE CRACKING OF THE DEBTOR'S BOILERS

Regarding the issue of whether the erroneous inclusion of steps on the castings caused the cracking of the boilers in issue, we begin by acknowledging, as the Defendant argues, that "but for" causation is generally insufficient to establish "proximate cause." *See National Controls Corp. v. National Semiconductor Corp.,* 833 F.2d 491, 496 (3d Cir.1987); *In re Direct Satellite Communications, Inc.,* 96 B.R. 507, 515–16 (Bankr.E.D.Pa.1989); and *Whitner v. Lojeski,* 437 Pa. 448, 454–62, 263 A.2d 889, 892–96 (1970). Rather, proximate cause is established only by a showing that certain conduct constitutes a "substantial factor" in causing the results which allegedly lead to liability. *Id.*

■ However, a plaintiff in a suit for breach of warranty does not have to establish that a particular defect is the proximate cause of the malfunction of a product supplied in order to succeed. *Kridler v. Ford Motor Company,* 422 F.2d 1182, 1185 (3d Cir.1970); and *MacDougall v. Ford Motor Co.,* 214 Pa.Super. 384, 388, 257 A.2d 676, 679 (1969). The existence of a malfunction alone establishes a "defective condition," and it is not necessary for the buyer to establish a specific defect or the reason why the goods did not properly perform in order to succeed in a breach of warranty claim. *See Greco v. Bucciconi Engineering Co.,* 407 F.2d 87, 89–90 (3d Cir.1969); *Carl Beasley Ford, Inc. v. Burroughs Corp.,* 361 F.Supp. 325, 331 (E.D. Pa.1973), *aff'd,* 493 F.2d 1400 (3d Cir.1974); and *Lenkiewicz v. Lange,* 242 Pa.Super. 87, 91, 363 A.2d 1172, 1175 (1976).

■ Moreover, here, we have little doubt that the presence of the steps was indeed the most substantial factor present which caused the inordinate cracking of the Debtor's boilers containing the Defendant's castings. Dr. Laird clearly expressed this opinion. The Defendant's metallurgist Ward, when pressed by the court directly, was forced to concur with Dr. Laird's assessment. There were, of course, many other hypotheses for the cause of the cracking prior to Dr. Laird's report. However, the parties had clearly not agreed to any hypothesis prior to Dr. Laird's report despite good-faith efforts of both parties to analyze the causation factor from late 1980 through April, 1987, when Dr. Laird's report was published. Dr. Laird also opined, without rebuttal, that the doubling in the number of tie-rods used in March, 1981, exacerbated the impact of the presence of the steps. We cannot ascertain for certain in the record whose idea it was to add the extra tie-rods. However, the steps were not recognized as the cause of the cracking at the time that the additional tie-rods were added, and the Defendant agreed to add them. Therefore, even if the Debtor made the initial proposal to add the extra tie-rods, we fail to see why this should alleviate the Defendant's liability. The erroneous inclusion of the steps was the primary causative factor.

The Debtor argues that the composition of the castings was in violation of the

ASME standards and this was a substantial contributing causative factor in the cracking that occurred as well. We cannot agree that the evidence in the record is sufficient to support this contention. The only evidence to support this contention was the report of Dr. Smierow, unenhanced by any testimony of Dr. Smierow himself; and the testimony of Ward, who admitted that he had not considered the possibly-relevant sulphur content of the castings and who conceded that the composition and thickness of some of the castings was deficient.

Though admitted into the record by the perhaps unwise insistence of the Defendant's counsel, we cannot attribute much value to Dr. Smierow's report. It is very difficult to assess and thus give great weight to opinions of experts who do not appear themselves to allow us to form our own impression of their credentials and reliability. *See In re Windsor Communications Group, Inc.,* 80 B.R. 712, 728 (Bankr.E.D.Pa.1987), *aff'd in part and rev'd in part on other grounds,* 96 B.R. 495 (E.D.Pa.1989); and *In re Chandler,* 77 B.R. 513, 517 (Bankr.E.D.Pa.1987), *aff'd,* C.A. No. 87–6516, 1988 WL 34921 (E.D.Pa. March 30, 1988).

Furthermore, Dr. Smierow's conclusions were based on inspection of only two representative castings and were contradicted by the testimony of Ward. Ward was candid in conceding the accuracy of Dr. Laird's hypothesis that the inclusion of the steps was a substantial factor in causing the cracking of the castings. This candor enhances his overall credibility as a highly-trained witness, if not an expert witness. We therefore place little value on the evidence purportedly establishing that the allegedly sub-standard metallurgical composition of the castings was a substantial factor in causing the cracking of the boilers.[5]

However, Ward's concession as to the validity of Dr. Laird's hypothesis undercuts almost entirely the Defendant's contention that the Debtor's improper, uneven torquing of the castings in assembling the blocks for its boilers was a substantial cause of their cracking. The evidence that the torquing was in fact uneven was scanty. The only evidence was that rusted blocks examined by Ward displayed varying torque levels. In our mind, these findings establish very little as to the torquing applied by the Debtor at the crucial time of assembly, effected long before the rusting occurred. A detailed description of the careful and proper torquing process utilized by the Debtor was related by William J. Bunting, its former quality controls manager. This testimony was convincing in establishing that the Debtor's employees were instructed how to properly torque the castings when assembling them into the blocks. We have no reason to believe that such instructions were not followed, and we therefore conclude that proper torquing therefore occurred. Furthermore, Dr. Laird convincingly testified that uneven torquing would, if anything, diminish rather than exacerbate the destructive impact of the steps.

We therefore conclude that the Defendant's placing of steps on the left-hand and intermediate castings constituted a breach of the Defendant's express warranty to produce castings consistent with the blueprints given to the Defendant by the Debtor and that this breach of warranty was the proximate cause of the excessive cracking of castings which resulted.

e. THE DEFENDANT ALSO BREACHED THE IMPLIED WARRANTY OF MERCHANTABILITY BY ERRONEOUSLY PLACING STEPS ON CERTAIN OF THE CASTINGS

 The Debtor alternatively contends that the Defendant breached the implied warranty of merchantability and the implied warranty of fitness for a particular

---

5. We also note that the Debtor apparently did not greatly value Dr. Smierow's report. Even after receiving it, the Debtor felt obliged to hire Dr. Laird to explore alternative hypotheses. The Debtor did not indicate any effort to call Dr. Smierow as a witness nor to get his report into the record, and ultimately it was admitted only because the Defendant's counsel so insisted. It was therefore apparent that the Debtor did not consider this report and its result to be a significant part of its case at trial.

purpose in its manufacturing process. These types of warranties are described in 13 Pa.C.S. §§ 2314 and 2315, respectively, which provide as follows:

> 2314(a) Sale by merchant. Unless excluded or modified (section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ...
>
> (b) Merchantability standards for goods.—Goods to be merchantable must be at least as such:
>
> . . . . .
>
> (3) are fit for the ordinary purposes for which such goods are used.
>
> 2315. Where the seller at the time of contracting has reason to know:
>
> (1) any particular purpose for which the goods are required; and
>
> (2) that the buyer is relying on the skill or judgment of the seller to select or furnish suitable goods;
>
> there is unless excluded or modified under section 2–316 (relating to exclusion or modification of warranties) an implied warranty that the goods shall be fit for such purpose.

Much of what has been stated in our discussion of breach of the express warranty under 13 Pa.C.S. § 2313 is conclusive in establishing violations of 13 Pa.C.S. § 2314 as well. The Defendant was clearly a merchant. Castings which crack when assembled into home-heater boilers are patently unfit for the purposes for which they were intended. The Defendant well knew the purpose for which the castings were to be used and that cracked castings would not be fit for their obvious purpose as components of home-heating boilers.

■ The element of causation has already been discussed in the context of the express warranty and the considerations are the same in the context of the implied warranty of merchantability. A manufacturer-merchant of castings implies that it will strictly adhere to blueprints with which it is supplied in producing same. Such implied warranties may persist even where express warranties are effectively dis-

claimed. *See Frigidinners, Inc. v. Branchtown Gun Club*, 176 Pa.Super. 643, 647–48, 109 A.2d 202, 204 (1954). Where, as here, an express warranty is found and has in no conceivable manner been excluded or modified, it is almost axiomatic that a breach of the pertinent implied warranty of merchantability will be found as well.

However, we are reluctant to conclude that a breach of the implied warranty of fitness for a particular purpose occurred. The Debtor did not rely upon the Defendant to select or furnish the model of the castings to be used in its boilers. Rather, the Debtor supplied the blueprints and expected the Defendant to use its skills to provide what the Debtor had selected as an appropriate model for castings. It was the failure to adhere to these blueprints which gave rise to breaches of the warranties described in 13 Pa.C.S. §§ 2313 and 2314. Little is gained and we believe that it would be improper to conclude that the Defendant violated 13 Pa.C.S. § 2315 as well.

3. WHILE THE DEBTOR'S ACCEPTANCE OF THE DEFECTIVE CASTINGS MAY RENDER THE DEBTOR LIABLE FOR THE PRICE OF SAME, THE LATENCY OF THE BREACHES OF WARRANTIES PRECLUDES THE DEFENDANT'S AVOIDANCE OF LIABILITY FOR THE BREACHES BECAUSE OF THE DEBTOR'S ACCEPTANCE OF THE CASTINGS

We have no difficulty in concluding that the Defendant breached the express warranty and the implied warranty of merchantability in its production of castings for the Debtor. However, there is no question that, until December 1, 1982, the Debtor chose to continue its relationship with the Defendant despite the difficulties that it was experiencing with the cracking of the boilers. Had it opted to simply cancel the parties' relationship at an earlier time, many of the problems that developed with the boilers and gave rise to this lawsuit could have been avoided. From 1981, when the cracking of boilers commenced,

through at least December 1, 1982, the Debtor and the Defendant were equally unsuccessful in ascertaining the cause of the cracking. It could be logically contended that the Debtor's own actions of continuing to accept the castings might eliminate or at least minimize the Defendant's liability. It is therefore important to ascertain what impact these facts have upon the Defendant's liability to the Debtor here.[6]

The UCC sections pertinent to these inquiries are 13 Pa.C.S. §§ 2607(a), (b), (c), (d), which provide as follows:

§ 2607. Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over

(a) Payment for accepted goods.—The buyer must pay at the contract rate for any goods accepted.

(b) Effect of acceptance on remedies for breach.—Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this division for nonconformity.

(c) Notice of breach.—Where a tender has been accepted:

(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; ...

(d) Burden of establishing breach.—The burden is on the buyer to establish any breach with respect to the goods accepted.

██ We believe that it is clear that, through December 1, 1982, the Debtor accepted the castings made for it by the Defendant. The Debtor has not articulated any action on its part that constituted a notice of revocation of the acceptance of any of the castings accepted by it. *See* 13 Pa.C.S. § 2608(b). Therefore, pursuant to 13 Pa.C.S. § 2607(a), it seems clear that, irrespective of whether the Debtor is entitled to damages for the Defendant's breaches of warranties, the Debtor is liable to the Defendant for the contract price of the castings. *See, e.g., Puritan Mfg., Inc. v. I. Klayman & Co.,* 379 F.Supp. 1306, 1310 (E.D.Pa.1974); *Traynor v. Walters,* 342 F.Supp. 455, 460 (M.D.Pa.1972); *United States Plywood Corp. v. Hudson Lumber Co.,* 127 F.Supp. 489, 496 (S.D.N.Y. 1954); and *In re Alloy Metal Wire Works, Inc.,* 52 B.R. 39, 40–41 (Bankr.E.D.Pa. 1985).

By reason of 13 Pa.C.S. § 2607(d), the burden of establishing a breach of the contract is upon the Debtor. However, we have already concluded that the Debtor has met that burden. *See* pages 192–96 *supra.*

██ The final issue is whether the Debtor acted "within a reasonable time" in notifying the Defendant about the breach, as required by § 2607(c)(1). It does not appear that the Debtor ever notified the Defendant of the precise action on its part which constituted a breach of warranty during the period that the parties were doing business, or for years thereafter. However, the Debtor clearly did provide the Defendant with notice that it was experiencing what it believed to be an inordinate percentage of cracked boilers containing the Defendant's castings from the outset of its perception of same. Although it did not advise the Defendant of the defect which caused the cracking, the defect in the castings in issue, being intensely "subtle," was a latent one. The defect was not discovered until Dr. Laird made his report

---

6. In its post-trial submissions, the Defendant argues some of these same points, but raises them as a defense to the Debtor's breach of warranty claim, contending that the Debtor's examination of the goods should have revealed the defects and hence that its liability for breaches of warranties can be avoided pursuant to the terms of 13 Pa.C.S. § 2316(c)(2) and Comments 8 and 9 to § 2316. This argument is another way of raising the issue of whether the Debtor's actions in response to the cracking problem were reasonable. We believe that these issues are more appropriately considered in the context of 13 Pa.C.S. § 2607, as the Debtor suggests, than in the context of § 2316.

over four years after the parties' business relationship ended. When a defect is thus "undetectable," prompt notice of the defect cannot be provided and therefore is not necessary. *See Vlases v. Montgomery Ward & Co.*, 377 F.2d 846, 849–50 (3d Cir.1967); *Neville Chemical Co. v. Union Carbide Corp.*, 294 F.Supp. 649, 654 (W.D. Pa.1968); and Annot., *Time Within Which Buyer Must Make Inspection, Trial, or Test to Determine Whether Goods Are of Requisite Quality*, 52 A.L.R.2d 900, 955–57 (1957).

We therefore conclude that, while the Debtor may be liable for the price of the castings accepted from the Defendant, it may make a recovery from the Defendant for all damages sufficiently proven by it to have been suffered as a consequence of the Defendant's breaches of warranties.

4. THE DEBTOR MAY RECOVER ONLY THOSE INCIDENTAL AND CONSEQUENTIAL DAMAGES REASONABLY FORESEEABLE AS A RESULT OF THE DEFENDANT'S BREACHES OF WARRANTIES, WHICH WE FIND TO BE ONLY THE COSTS OF REPLACING THOSE BOILERS WHICH CRACKED, i.e., $208,552.52

Having determined that the Debtor is entitled to certain damages because of the Defendant's breaches of the warranties, we turn again to the UCC for guidance as to the parameters of collectible damages. The pertinent provision is 13 Pa.C.S. § 2715, which provides as follows:

§ 2715. Incidental and consequential damages of buyer

(a) Incidental damages.—incidental damages resulting from the breach of the seller include:

(1) expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected;

(2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and

(3) any other reasonable expense incident to the delay or other breach.

(b) Consequential damages—Consequential damages resulting from the breach of the seller include:

(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(2) injury to person or property proximately resulting from any breach of warranty.

■ The range of collectible damages for breaches of warranties case is not really different from those in any matters alleging a breach of contract: the damages must have been proximately caused by the breaches and the consequences for which damages are sought must have been foreseeable to the defendant at the time of contracting. Annot., *Buyer's Incidental & Consequential Damages from Seller's Breach Under UCC § 2-715*, 96 A.L.R.3d 299, 308–12 (1979) (hereinafter cited as *"Damages Under UCC § 2-715"*).

■ As we have noted in the past, the plaintiff always has the burden of establishing damages with reasonable certainty by proper evidence. *See Windsor Communications, supra*, 80 B.R. at 727; and *In re Chapman*, 77 B.R. 1, 6 (Bankr. E.D.Pa.1987). We are reluctant to rule out any elements of damage which are supported by the requisite evidence. *See In re Jackson*, 92 B.R. 987 (Bankr.E.D.Pa.1988); and *Lampus, supra*, 474 Pa. at 209, 378 A.2d at 292. On the other hand, recoverable damages may be reduced by a duty to mitigate same, on which issue the plaintiff, having superior means of proof, should bear the ultimate burden. *See In re New York City Shoes*, 86 B.R. 420, 424–25 (Bankr.E.D.Pa.1988).

We now shall apply these general principles to the facts at hand. Underlying our entire analysis is our observation that the defendant's misreading of the blueprints in issue, while erroneous, was not unreasonable. We consider the reduced degree of the Defendant's culpability in determining the appropriate measure of damages here.

*See S.J. Groves & Sons. Co. v. Warner Co.*, 576 F.2d 524, 527 (3d Cir.1978) (Court of Appeals affirms trial court's allocation of damages to twenty-five (25%) percent of the plaintiff's losses because other factors caused the losses).

The Debtor is entitled to the reasonable costs incurred by it in replacing the boilers which cracked as a result of the Defendant's breaches of warranties. *See Kunststoffwerk Alfred Huber v. R.J. Dick, Inc.*, 621 F.2d 560, 563 (3d Cir.1980); *Council Bros., Inc. v. Ray Burner Co.*, 473 F.2d 400, 405–08 (5th Cir.1973); and Annot., *Damages Under UCC § 2–715, supra*, 96 A.L.R.3d at 360. The Debtor, in each of its forms documenting replacements of boilers which cracked to its customers, included the credit given to the customer, plus a $28 freight charge in and/or out, an administrative labor cost of $30.00, and a charge of $61.94 for two hours of labor costs. The latter figure included not only the $6.00 per hour paid by the Debtor to its laborers, but indirect labor costs allegedly incurred in handling the castings returned, which Theodore Kingsley, the Debtor's former chief financial officer, contended had been established by to a prior study. On cross-examination, Mr. Kingsley conceded that he could not, at this time, provide any details regarding the study. Consequently, the Defendant argues that we should allow only the $12.00 wages paid to the laborers as labor costs.

We decline to so limit the Debtor's demands as to this element of damages. The additional $24.97 per hour added for indirect labor costs does not appear to be unreasonable and has, in our view, been adequately, if not completely, explained. Therefore, as to this element of damages, we are prepared to give the Debtor the benefit of any doubt, recognizing that damages "need not be proved with mathematical certainty, only reasonable certainty." *E.C. Ernst, Inc. v. Koppers Co.*, 626 F.2d 324, 357 (3d Cir.1980); *Windsor Communications, supra*, 80 B.R. at 727–28; and *Chapman, supra*, 77 B.R. at 6–7. Hence, we find that the Debtor is entitled to the $208,555.52 sum set forth in Finding of Fact 37, page 191 *supra*.

However, we are not prepared to allow the Debtor any of the other components of damages sought, enumerated in Finding of Fact 38, page 191 *supra*, because we believe that, in each instance, the Debtor failed to present sufficient evidence to meet its burden of proving that the Defendant should be charged with any of those elements of damage.

Two of the elements relate to losses suffered by Vaillant, which were allegedly passed on to the Debtor. We do not doubt that, if the Debtor were able to establish a link in the chain of losses to the Debtor's pocket, irrespective of whether the losses were suffered by Vaillant in the first instance, such losses could be recoverable as damages by the Debtor. *See Neville Chemical, supra*, 294 F.Supp. at 658–59. However, where such a "chain reaction" of damages is claimed, evidence "in great detail" of each the consecutive links of the chair are necessary. *Compare id.* Here, several of the links in each chain are weak.

The first element sought is recovery of $113,000 which the Debtor ultimately allowed to Vaillant under the warranty provisions of the exclusive Distribution Agreement of November 2, 1982, setting off a claim of $112,222.86 which the Debtor had against Vaillant. The only evidence relating this element of damage to the Defendant was testimony of the Debtor's former president and sole shareholder, Theodore Bunting, that Vaillant had a claim of $113,000 relevant to breaches of warranties, and that this amount was ultimately set off against the Debtor's approximately equal claim. The only documentary evidence supporting this claim is a letter from counsel for Vaillant, dated April 2, 1984, confirming the settlement. There are no details of any sort as to how the $113,000 figure itself was computed. Obviously, claims which Vaillant had under the warranty provision of the Distributor Agreement could have related to matters other than cracking of the castings produced by the Defendant and could have been measured in any fashion. Without so much as

a scrap of documentation or any clear oral testimony linking the $113,000 figures to damages caused by boilers manufactured by the Debtor, we cannot impose this element of damage upon the Defendant.

The other element of Vaillant-related damages is a demand for $56,438.29, which is reflected in credit memoranda utilized in documenting costs for replacing the boilers of customers containing defective castings manufactured by the Defendant after Vaillant took control of the Debtor's sales functions in November, 1982. The difficulty with this element of damages is not, as in the case of the $113,000, the lack of specificity in attributing these claims to the Defendant. Indeed, documentation reflecting each boiler returned and the costs associated therewith has been produced. Here, the difficulty is that there is no showing, as there was to some degree in the case of the $113,000 element of damages, that the costs incurred by Vaillant from these defective boilers were passed on to the Debtor. Without some positive showing in this regard, we cannot and will not assume that any such pass-throughs in fact transpired. Therefore, we shall disallow both of the Vaillant-related elements of damages.

■ The Debtor demands $15,000 for what it contends was "at least" the costs of instituting the additional air-pressure tests as of August, 1980, when it first discovered an unusually high percentage of cracking of boilers containing castings manufactured by the Defendant. We do not question the propriety of allowing additional costs for testing as an element of incidental damages against a party who has breached warranties in supplying the products tested, thus necessitating this extra measure of care. *See* Annot., *Damages Under UCC § 2-715, supra,* 96 A.L.R.3d at 349–50. However, here, there is no evidence in the record regarding the actual cost to the Debtor of performing such tests. We cannot guess and find, as the Debtor apparently hopes, that such tests must have cost at least $15,000. Secondarily, the Debtor has presented no evidence tending to establish the efficacy of these tests to ferret out leaking boilers. Horning specifically stated, without rebuttal, that, when he visited the Debtor's plant in March, 1981, he strongly suggested that these tests be discontinued. We do not think that the Debtor can recover, from the Defendant, the costs of testing which the Defendant expressly disapproved, without at least some measure of rebuttal as to why these tests were in fact necessary and appropriate. This element of damages will therefore be disallowed.

■ The final element of consequential damages sought is the cost of a recall program instituted by the Debtor in February, 1983, which is documented by individual memoranda referencing 259 boilers recalled, which comes to a sum total of $86,845.32. The exhaustive annotation on incidental and consequential damages allowable in such circumstances, *Damages Under UCC § 2-715, supra,* contained neither a discussion of nor a citation to of any cases in which damages occasioned by a recall program for defective goods were passed along to the party responsible for the defects. Also, we located no cases addressing this issue and the parties cited us to none.

We would nevertheless be inclined to hold that, in an appropriate case, where the record supports the logic and reasonability of costs of same, this element of damages should be allowed. The absence of authority should create, however, a somewhat heightened burden upon the Debtor to establish that such a claim is allowable. As in the case of many of the other elements, several of the links in the evidentiary chain of proof necessary to impose such costs upon the Defendant are weak.

In this regard, we note that the recall program was not instituted until after the Debtor had directed the Defendant to make no further shipments to it. This appears to be a belated response to the cracking problem since an inordinate incidence of cracked boilers with castings supplied by the Defendant had been observed by the Debtor since 1981. The timing of the program seems completely arbitrary, as there is no evidence that instances of cracked boilers containing the Defendant's castings dramatically increased at or about the time

that the recall-program was instituted in February, 1983.

A quantitative analysis of the parties' relationship also raises certain questions about the recall program. The Defendant supplied about 15,000 boilers to the Debtor throughout the entire period of the parties' relationship. *See* Finding of Fact 21, page 189 *supra.* The Debtor has produced evidence that 374 boilers containing castings manufactured by the Defendant cracked and were replaced by it, and we have held that it is entitled to the damages therefor. *See* pages 198–99 *supra* and Finding of Fact 37 & n. 1, page 191 *supra.* The Vaillant replacements, totalling $56,438.29, involved 115 additional boilers. The recall program involved 259 boilers. We were advised at one point that 600 boilers failed, although we note that the number of returns only appears to be 374 plus 115, or 489. Assuming the 600 figure, there was a failure rate of about four (4%) percent. We are not able to conclude instinctively that a failure rate of four (4%) percent would justify a recall of every boiler manufactured by the Defendant. Furthermore, the fact that only 259 boilers were recalled clearly indicates that *all* of the boilers including castings manufactured by the Defendant were *not* recalled. Over 14,000 remained in place. This raises an unaddressed and unanswered question as to why the Debtor (or Vaillant) saw fit to recall these particular 259 boilers.

In sum, we find that the Debtor has failed to meet its heightened burden necessary to pass the costs of its recall program along to the Defendant. We shall therefore allow the Debtor to recover from the Defendant only the $208,555.52 sum directly documented as attributable to replacing boilers that actually did manifest cracked castings.

5. THE DEFENDANT IS ENTITLED TO SET OFF THE CONTRACT PRICE OF THE BOILERS ACCEPTED BY THE DEBTOR, *i.e.,* $187,-408.18, AGAINST THE DAMAGES RECOVERABLE BY THE DEBTOR FROM IT

In our prior discussion of the impact of 13 Pa.C.S. § 2607(a) at pages 196–

98 *supra,* we concluded that the Debtor was liable to the Defendant for the price of the castings which it accepted. Out of $200,523.71 claimed by the Defendant for the price of accepted castings, $13,115.53 does not fit within this category. A charge of $12,848.83 was added for castings remaining in the Defendant's inventory as of December 1, 1982, the date that the Debtor directed the Defendant to cease making shipments. As it developed, the Debtor was correct in its contention that the Defendant was producing non-conforming castings. As a result, it was legally justified in refusing to accept further castings from the Defendant and it is not liable to the Defendant for the price of castings which it did not accept. In addition, the Defendant added the cost of a small shipment involved on December 17, 1982, in the amount of $266.70. This shipment, also being after the December 1, 1982, date, cannot be charged to the Debtor, as rejection of acceptance of this shipment was similarly justified. The deductions of the $12,848.83 and $266.70 entries reduce the Defendant's claim for castings duly accepted by the Debtor to $187,408.18.

A significant issue of bankruptcy law, not addressed by either party, is whether the Defendant should be allowed to set off its claim of $187,408.18 against the Debtor's claim of $208,555.52. This issue is controlled by 11 U.S.C. § 553(a), which provides, in pertinent part, as follows:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, . . .

The debts of each party to the other undoubtedly both arose prior to the Debtor's filing of the underlying bankruptcy case. The significant question is whether the debts are mutual. *Compare In re TM*

*Carlton House Partners, Ltd.*, 93 B.R. 859, 867–72 (Bankr.E.D.Pa.1988) (non-debtor tenant entitled to set off pre-petition breach of warranty claims against pre-petition rent obligations to debtor landlord), *with In re Windsor Communications Group, Inc.*, 79 B.R. 210, 215–17 (E.D.Pa. 1987) (setoff not permitted because non-debtor's wrongful act of conversion destroys mutuality); *In re New York City Shoes, Inc.*, 78 B.R. 426, 430–32 (Bankr.E. D.Pa.1987) (bank's right to claim setoff is limited because allowing same, pursuant to an adhesion contract, would tend to frustrate the debtor's reorganization); and *In re Lessig Construction, Inc.*, 67 B.R. 436, 440–43 (Bankr.E.D.Pa.1986) (setoff not permitted because the claims of non-debtor partially arose post-petition and related to projects different from those to which the debtor's claims related, destroying mutuality). The common thread running through those cases is that setoff is an equitable concept and will be applied as such by bankruptcy courts, sitting as they do as courts of equity.

The *Lessig* case, *id.* at 443–44, also raises a potential procedural problem in allowing setoff to the Defendant here. The Defendant has not requested relief from the automatic stay to assert a claim of setoff. Indeed, it has raised its claim against the Debtor in the form of a counterclaim in answer to the adversarial complaint, a mode which could have caused us to relegate its assertion of this claim to the claims process. *See, e.g., In re Clark*, 91 B.R. 324, 338–42 (Bankr.E.D.Pa.1988); *In re New York City Shoes*, 84 B.R. 947, 960 (Bankr.E.D.Pa.1988); and *In re International Endoscope Manufacturers, Inc.*, 79 B.R. 620, 621–22 (Bankr.E.D.Pa.1987). However, we held, in *Carlton House, supra*, 93 B.R. at 870, that asserting a demand for relief "in the nature of" setoff is the equivalent of seeking relief from the automatic stay from the bankruptcy court to assert a setoff. We stated there that the important consideration is "bankruptcy-court control over the process," suggesting that the bankruptcy court, in appropriate

circumstances, might allow a setoff in a case before it even if the non-debtor claiming setoff has not expressly asked for relief from the automatic stay. *Id.*

We recognize that, in one sense, allowing setoff will give the Defendant a priority over the Debtor's other creditors. *See Windsor, supra*, 79 B.R. at 215–16; and *Lessig, supra*, 67 B.R. at 441. Given the Debtor's plan of payment of only ten (10%) percent of their allowed claims to unsecured creditors, disallowing setoff here would reduce the Defendant's claim to $18,740.82. In one sense, this is all that the defendant, as an unsecured creditor, is entitled to recover on its claim.[7] However, we have emphasized throughout this Opinion our belief that the Defendant's error in placing steps on certain of the castings was far from egregious, and that it would be inequitable to impose substantial monetary damages upon it for damages caused by this act as a result. Furthermore, the facts of this case are more like those of *Carlton House, supra*, 93 B.R. at 868–70, where the claims arose from the same undertaking, than the claims arising from entirely different construction projects in issue in *Lessig*, 67 B.R. at 442. Therefore, as in *Carlton House, supra*, 93 B.R. at 871–72, we shall allow the non-debtor party to exercise the right of setoff against the Debtor's claim. We will therefore allow the Defendant to set off its just claim of $187,408.18 against the Debtor's claim of $208,555.52, reducing the net amount of the Debtor's damages to $21,147.34. This result, of course, eliminates the Defendant's claim and frees this net recovery as a fund for distribution to the Debtor's other creditors, assuming it is not exhausted by a claim of its special counsel for compensation.

6. THE INDEFINITE NATURE OF THE CLAIMS OF THE PARTIES *INTER SE* ELIMINATES ANY CLAIM OF EITHER PARTY TO PRE-JUDGMENT INTEREST

The parties both cite to *Palmgreen v. Palmer's Garage, Inc.*, 383 Pa. 105, 108,

---

7. We have been informed, by the Debtor's general bankruptcy counsel, that no distribution of any amount has been made to the Defendant because the objection to its proof of claim remains outstanding.

117 A.2d 721 (1955), as authority for the principle that, since their respective damages are "ascertainable by computation," they are entitled to pre-judgment interest against the claims of the other. However, we cannot agree that the Debtor's claim against the Defendant, consisting as it does of a wide variety of elements of consequential and incidental damages, less than half of which we have sustained, are sufficiently definite to justify such a demand. Rather, we find this claim "so indefinite" that we believe that such an award of pre-judgment interest would be inappropriate. *See In re Franks*, 95 B.R. 346, 354 (Bankr.E.D. Pa.1989).

The Defendant's claim for the unpaid price of goods delivered is the type of claim on which, in contrast to the Debtor's claim, pre-judgment interest would normally be collectible. However, two rather obvious pitfalls bar any such recovery here. First, the Debtor's claim against the Defendant exceeds and therefore supersedes any claim of the Defendant against the Debtor. There is, hence, no justified collectible net claim of the Defendant against the Debtor. Secondly, an unsecured creditor of a debtor in bankruptcy, such as the Defendant, is barred from receiving post-petition interest on its claim. *See, e.g., In re Herbert*, 86 B.R. 433, 438 n. 3 (Bankr.E.D.Pa.1988); and *In re Shaffer Furniture Co.*, 68 B.R. 827, 830 (Bankr.E.D.Pa.1987). Any pre-judgment interest claim would therefore have ceased accruing almost six years ago on May 17, 1983, the date of the Debtor's Chapter 11 filing.

Therefore, no pre-judgment interest shall be allowed as an element of either party's claims against the other.

### E. CONCLUSION

For the foregoing reasons, we will enter an order awarding the Debtor a net judgment of $21,147.34 against the Defendant. We will also recite therein that, having set off the Defendant's proof of claim against the Debtor's claim, that claim is thereby exhausted and must be stricken.